742 So.2d 642 (1999)
Booker T. GLADNEY, et al., Plaintiffs-Appellees,
v.
William J. SNEED, et al., Defendants-Appellants.
No. 32,107-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1999.
Opinion Denying Rehearing September 16, 1999.
*644 Pettiette, Armand, Dunkelman, Woodley & Byrd by Lawrence W. Pettiette, Jr., Shreveport, Watson, Blanche, Wilson & Posner by Robert W. Robison, Jr., Michael M. Remson, Baton Rouge, Counsel for Defendants-Appellants.
Sam N. Gregorio, Edmund M. Thomas, Shreveport, Counsel for Plaintiffs-Appellees.
Before NORRIS, C.J., and PEATROSS and DREW, JJ.
NORRIS, Chief Judge.
The Louisiana Patient Compensation Fund (LPCF) appeals a jury verdict awarding the plaintiffs $900,000 in damages, which was reduced to $500,000 by the judgment pursuant to the statutory cap of La. R.S. 40:1299.42, for the wrongful death of their daughter Carolyn Gladney, who died as a result of shock while at Huckabay Hospital. LPCF further appeals the percentage fault assessed to Huckabay. Huckabay appeals the imposition of costs. We amend and as amended affirm.

Facts
On December 7, 1985, Carolyn Gladney was driving her Chevy Citation from Natchitoches to Shreveport when William Sneed passed her in another vehicle, sideswiped her, ran her off the road, and drove off. Gladney caught up with Sneed, and forced him to stop. Gladney got out of her vehicle and started to walk to Sneed's car when he drove away. While Gladney was walking back to her car, Otis Goolsby struck her with his vehicle. Gladney was transported to Huckabay Hospital where Dr. Rick Ramsey, a second-year pediatric resident, was the attending emergency room physician.
Upon arriving at Huckabay, Gladney's skin was cool and clammy and her blood pressure was 95/55, which according to expert testimony was indicative of shock. Gladney received 200 cc's per hour of fluid and was x-rayed. Approximately three hours after arriving at Huckabay, Gladney *645 "coded" and Dr. Ramsey tried unsuccessfully to revive her. According to Dr. George McCormick, who performed the autopsy, Gladney died of treatable shock.
Gladney's parents, Booker and Florean Gladney sued Sneed, his insurer GEICO, Goolsby, his insurer State Farm, Dr. Ramsey and his insurer, and Huckabay. Dr. Ramsey was found to not be a qualified health care provider. During the pendency of the suit, Florean died of cancer and her four children were substituted as plaintiffs. With the exception of Huckabay, all defendants settled with the Gladneys. After a trial on the merits, a jury found Huckabay 90% at fault for Gladney's death, and Dr. Ramsey 10% at fault. The jury awarded Booker $550,000 and Florean $325,000; the trial court reduced these proportionately to $315,000 and $185,000 pursuant to the statutory cap. La. R.S. 40:1299.42. At a rule nisi to tax costs, Huckabay was ordered to pay the costs of the experts, totaling $14,083.95. LPCF appeals the assessment of fault and quantum of the award. Huckabay appeals the ruling that assessed it costs.

Law and Analysis: Allocation of Fault
Factual findings of a jury are accorded great weight and will not be disturbed on appeal absent manifest error. Stobart v. State, 617 So.2d 880 (La.1993). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. Id. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id.; Rosell v. ESCO, 549 So.2d 840 (La.1989). Additionally, in a medical malpractice action, a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments and opinions on whether the standard of care was met in any given case. Hunter v. Bossier Medical Center, 31,026 (La.App.2d Cir.9/25/98), 718 So.2d 636, and citations therein.
In a medical malpractice action against a hospital, the plaintiff must prove that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. Hunter v. Bossier Medical Center, supra. A hospital is bound to exercise the requisite standard of care toward a patient that the particular patient's condition may require. Id. A defendant's conduct is considered to be a cause in fact of the injury if but for his conduct the harm would not have occurred, or his conduct is a substantial factor in bringing about the harm. Dent v. Perkins, 629 So.2d 1354 (La.App. 4th Cir.1993), writ denied 94-0116 (La.3/18/94), 634 So.2d 853. A substantial factor need not be the only causative factor, it need only increase the risk; there can be more than one cause in fact of an accident. Id.; Hampton v. Greenfield, 576 So.2d 630 (La.App. 4th Cir.), writ denied 581 So.2d 686 (1991); Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
A trial court's findings regarding percentages of fault are factual and will not be disturbed on appeal unless manifestly erroneous, or clearly wrong. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Lewis v. Barnes, 31,342 (La.App.2d Cir.12/9/98), 722 So.2d 341; Devereux v. Allstate Ins. Co., 557 So.2d 1091 (La.App. 2d Cir.1990). In determining percentages of fault, the trier of fact shall consider both the nature of the conduct of each party and the extent of the casual relation between the conduct and the damages. Watson v. State Farm, 469 So.2d 967 (La.1985); Lewis v. Barnes, supra; Devereux v. Allstate Ins. Co., supra. In assessing the conduct of the parties, the factors to consider include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) *646 how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm, supra; Devereux v. Allstate, supra.; Williams v. Jefferson Hosp. Service Dist. No. 2, 604 So.2d 1046 (La.App. 5th Cir.), writ denied 609 So.2d 260 (1992). After a court of appeal finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement v. Frey, supra.
LPCF urges on appeal that the jury's allocation of fault, 90% to Huckabay and only 10% to Dr. Ramsey, is plainly wrong. In brief it concedes that both parties fell beneath the standards of care and that their respective breaches contributed to Gladney's death. It contends, however, that Ramsey's share of the fault was considerably larger than the 10% assessed. Specifically it argues that the treating physician bears the ultimate responsibility for transferring a patient; after deciding that one was needed, Ramsey failed to effectuate the transfer, making him at least as much at fault as the hospital, which had institutional problems obstructing the transfer. LPCF also argues that the jury was plainly wrong to accept certain portions of Dr. Ramsey's testimony, specifically his statements that the hospital's laryn-goscope was broken and that the ER lacked an essential drug, epinephrine. LPCF argues that these assertions were not supported by other evidence and distorted the jury's view of the allocation of fault. LPCF suggests that Dr. Ramsey's fault should be increased to 50%.
The evidence concerning the failure to transfer was extensive. The plaintiffs' expert in emergency medicine, Dr. Edward Morgan, described the decision to transfer a patient as a "physician function." One of the plaintiffs' expert RNs, Terri Kevil, and the defendant's expert in emergency medicine, Dr. Wyche Coleman, agreed that transferring the patient is the doctor's responsibility. In fact, an LPN named Dora Weaver testified that according to the primary nurse in the ER, Nurse Gilbert (who is now deceased and unavailable to testify), Gladney was actively requesting a transfer because of vaginal bleeding. Nurse Gilbert voiced her own concerns about the timeliness of the transfer to the other nurses in the emergency room. In short, this record supports the contention that Dr. Ramsey had the primary responsibility for ordering a transfer and breached the standard of care by failing to do so.
The record also shows, however, that Huckabay is a rural hospital and not equipped to handle multiple trauma patients like Gladney. Despite this, Huckabay had no protocol or procedure for making transfers to larger hospitals. Nurse Kevil, as well as James Massey, plaintiffs' expert in hospital administration, testified that this was a breach of the hospital's standard of care. Nurse Kevil also testified that when a nurse sees that a necessary transfer has not been made, she must go to the "chain of command" and "above the doctor" to take actionsomething which was not done in this case. Thus a rational juror could find that although Dr. Ramsey bore the initial burden of ordering a transfer, the hospital's failure to have a transfer protocol hindered the process and the nurses failed to intervene. The record therefore supports a finding that Ramsey and the hospital were perhaps equally at fault for failing to transfer Gladney.
The other evidence, however, supports the conclusion that the hospital was at greater fault than Dr. Ramsey. For example, the Gladneys showed that Huckabay breached its own credentialing procedures in hiring a physician who lacked the necessary training, expertise, or demonstrated competence to work the ER. Dr. Huckabay, the hospital's chief of staff (and 65% owner of the facility) described the *647 process for screening applicants, but Ramsey was not properly evaluated before he was hired. Dr. Morgan testified that it was beneath the standard of care for the hospital to place a second-year pediatric resident in an ER setting, and that his lack of experience contributed to Gladney's death. The jury could reasonably find that the breach of credentialing created an environment ripe for malpractice.
The record further supports the conclusion that the nurses failed to notice that Gladney was in shock and that this failure was substandard. After initially noting that she arrived with cool and clammy skin and a blood pressure of 95/55, they did not advise Dr. Ramsey that the patient was likely in shock; they failed to place her on IV fluids, elevate her feet above her head and give oxygen as neededall elements of the nurses' standard of care. Dr. Ramsey testified that although he ordered the administration of 500 cc's of fluid per hour, Gladney received only about 200 cc's per hour because the IV infiltrated, or delivered the fluid to the surrounding tissue instead of the vein. Huckabay's nursing director, Jo Lawson, testified it is the nurse's duty to discover infiltration and correct it. In addition, the scanty nurses' notes support a conclusion that vital signs were not taken regularly, thereby depriving Dr. Ramsey of critical and ongoing information about Gladney's condition.
One controversial fact was Nurse Gilbert's administration of Valium and morphine to Gladney. According to the experts, this mixture of drugs is counter-indicated for a patient with symptoms of shock. It was a breach of the standard of care for Dr. Ramsey to order these drugs for Gladney, but according to Nurse Kevil, a nurse should have known the effects of these medications and refused to administer them. As with Huckabay's lack of a transfer policy, Nurse Gilbert's failure to notice or protest an improper drug effect compounded Dr. Ramsey's initial acts of medical malpractice.
The factual elements contested by LPCF in briefwhether the laryngoscope was broken and whether the ER had any epinephrineare subject to the manifest error rule. Dr. Ramsey, who admittedly had some motivation to blame the hospital for his deficiencies, testified that after Gladney coded he attempted to follow the standard of care by using the laryngoscope, but the one provided was broken, and by administering epinephrine, but there was none in the ER. Betty Rollins, an LPN on duty at the time, testified that before she handed it to Dr. Ramsey, she checked the laryngoscope and it was working properly; Lewis Bryant, an EMT and security guard on duty at the time, also testified that the device was working properly when he removed it from the "crash cart." Both of these witnesses are in Huckabay's employ and would have some motivation to pass blame to Dr. Ramsey. Simply put, the jury was presented with diverse accounts from interested witnesses and apparently accepted the physician's version. Under the circumstances we cannot disturb this credibility call. Stobart v. State, supra.
Based on the whole record, the jury could reasonably find that both Huckabay and Dr. Ramsey breached their respective standards of care, and that Gladney would have survived had they properly diagnosed and treated her for shock, promptly transferred her, or both. The jury was obviously not impressed with Huckabay's failure to assure that its ER physician was qualified and competent for the position, and its absence of a transfer protocol even though such would seem essential to a small hospital. However, Dr. Ramsey obviously and critically breached the standard of care he owed to Gladney, and we find that his conduct in the ER mandates a larger share of fault Therefore, we find that the jury was manifestly erroneous, or clearly wrong, in assessing Dr. Ramsey with only 10% fault and subsequently raise his percentage of fault to 25%, the lowest point which the jury could *648 reasonably find him at fault. Clement v. Frey, supra; Socorro v. City of New Orleans, supra. The allocation of fault is therefore amended, and as amended, affirmed.

Quantum
Much discretion must be left to a jury in the assessment of damages in tort cases. La. C.C. 2324.1. An appellate court may disturb a damage award only when the record clearly reveals that the trial court abused its discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Powell v. RTA, 96-0715 (La.6/18/97), 695 So.2d 1326; Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
LPCF argues that the quantum is excessive.[1] The Gladneys respond that the quantum appealed is actually the reduced amount set forth in the judgment, not the full verdict amount. The jury awarded Booker $550,000 and Florean $350,000; however, the trial court reduced these awards to meet the statutory cap, and apportioned them under the cap. See, e.g. Harden v. Southern Baptist Hosp, 94-2228, 94-2229 (La.App. 4th Cir. 10/12/95), 663 So.2d 443, writ denied 95-2751 (La.1/26/96), 666 So.2d 676. Appeal lies from the judgment, not the reasons therefor. Hardin v. Munchies Food Store, 521 So.2d 1200 (La.App. 2d Cir.), writ denied 523 So.2d 1321 (1988). The amount in dispute is obviously that set forth in the judgment, not the verdict. Harden v. Southern Baptist Hosp., supra; Hollingsworth v. Bowers, 96-257 (La.App. 3d Cir.12/30/96), 690 So.2d 825.
At the time of Carolyn Gladney's death, she was 25 years old. She had graduated from Northwestern and had chosen to work in the field of social work. According to testimony, Gladney was planning on returning to school to earn her masters. Gladney was the first member of her family to graduate from college. After finishing her degree, Gladney lived in Houston, Tx. for a short period of time, before returning home to live with her parents. According to testimony, the relationship *649 between Carolyn Gladney and her parents was a close and loving one. Her father testified that he had a special type of communication with Gladney and her loss left a big empty spot in his heart. He was still profoundly grieving over his loss at the trial, over 10 years after the accident. Booker also testified that his wife and Gladney were close and she never fully adjusted to the loss of her oldest daughter.
According to testimony, Gladney played an active part in her parents' lives. Gladney made multiple large purchases for her parents in order to improve their living conditions. She bought her father a television and her mother a stove, and a refrigerator for the home. She additionally bought her mother the only silk dress Florean ever owned, which she was subsequently buried in. After Gladney's death, her mother developed cancer and died and her father became a partial quadriplegic due to a disability unrelated to Gladney's accident, and became wheelchair bound. According to uncontradicted testimony, Gladney was the type of daughter who would have cared for her mother while she was suffering from cancer, and cared for her father while he was disabled.
Testimony also revealed that Gladney was engaged to be married and expecting her first child. According to the testimony, she was excited about the marriage and was buried in her wedding dress. After her marriage, Gladney would have moved out of her parents' home, but according to testimony would have continued to maintain a close relationship with both her parents.
Mattie Pierson, a lifelong friend of Booker's and Florean's, testified that Gladney was a role model for others and a very giving and caring person. Gladney encouraged Pierson's daughter to try hard in school and get an education. Pierson testified that her daughter attended college and her success is due in part to Gladney's influence. Kenneth Hall, a friend of the family, testified that the Gladney family was very close knit and had a wonderful relationship. He stated that he envied the relationship because it seemed much closer than normal.
The jury apparently found that Gladney had an extraordinary close relationship with her parents. She was living with her parents, and had a proven history of helping around the house and provided necessary appliances for the household. Additionally, at the time of her death Gladney was actively planning her parents' 25th anniversary celebration. Her death was a great blow to parents who loved her, and relied on her support, both emotionally, physically, and financially. Furthermore, at the time of her death she was pregnant with Booker's and Florean's grandchild. The jury was able to view the witnesses and apparently found that though she was planning on marrying and moving out of their home, Gladney would have maintained her close relationship with her parents and been the type of child to care for them during their illnesses and disabilities. The record shows that Gladney was a giving and caring person and would have likely maintained an actively helpful role in her parents' lives. She provided them comfort and support, and was well on her way to providing them with grandchildren. In short, she and her parents had a "uniquely close" relationship, thus distinguishing the case from our synopsis in Johnson v. Gantt, 606 So.2d 854 (La.App. 2d Cir.), writ denied 608 So.2d 196 (1992). Therefore, the awards of $315,000 and $185,000 are not excessive and are within the trial court's discretion. See also Gore v. Snider, 590 So.2d 677 (La.App. 3d Cir.1991) (affirming an award of $225,000 to two parents for the wrongful death of a daughter); Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3d Cir.2/15/95), 651 So.2d 865, writs denied 95-0667, 95-0676 (La.4/28/95), 653 So.2d 592, 593 (affirming the award of $325,000 to two parents for the wrongful death of an adult son); Bryant v. Solomon, 97-2008 (La.App. 4th Cir. 3/25/98), 712 So.2d 145 (affirming an award of $300,000 to one *650 parent for the wrongful death of an adult daughter). The quantum is affirmed.

Costs
The trial court cast Huckabay with the court costs, a total of $14,083.95. Huckabay appeals the trial court's ruling, arguing that its liability is limited to $100,000 plus interest, and that LPCF is liable for any amount over $100,000 which is not interest. La. R.S. 40:1299.42. LPCF argues that according to La. C.C.P. art.1920, the court can cast any party with cost, and Huckabay is a party and they are not.
La.Code of Civ. Proc. art.1920 provides that "[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party...." La. R.S. 40:1299.42 provides:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient ... shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon ...
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund ...
In instances of conflict, a statute specifically directed to the matter at issue will prevail as an exception to a statute more general in character. Horil v. Scheinhorn, 95-0967 (La.11/27/95), 663 So.2d 697. Article 1920 is a general rule for the assessment of costs, while R.S. 40:1299:42 B specifically limits the health care provider's liability for costs in medical malpractice actions. The instant judgment obviously subjects Huckabay to damages in excess of $100,000 plus interest, contrary to the special statute. As such, the judgment is amended to cast LPCF with costs.

Conclusion
We find that the jury's finding that Huckabay was 90% at fault and Dr. Ramsey only 10% at fault was manifestly erroneous and lower Huckabay's percentage fault to 75%, and raise Dr. Ramsey's to 25%. The damage award of $500,000 is affirmed. This judgment is amended to assess costs to LPCF, not Huckabay. Costs of this appeal are also assessed to LPCF.
AMENDED AND AS AMENDED AFFIRMED.
Before NORRIS, C.J., and STEWART, GASKINS, PEATROSS and DREW, JJ.

ON REHEARING
PER CURIAM ON REHEARING.
Rehearing denied. As a general rule, courts of appeal will not consider issues raised for the first time on appeal. Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714; Dier v. Hamilton, 600 So.2d 117 (La.App. 2 Cir.1992); URCA Rule 2-12.4. We also decline to address issues advanced for the first time on application for rehearing. Doucet v. Champagne, 94 1631 (La.App. 1 Cir. 4/7/95), 657 So.2d 92, writs denied 95-1759, 95-1887 (La. 11/3/95), 661 So.2d 1379, cert denied sub nom. Louisiana DOTD v. Doucet, 517 U.S. 1120, 116 S.Ct. 1353, 134 L.Ed.2d 522 (1996).
PEATROSS and DREW, JJ. would grant the rehearing.
NOTES
[1] At oral argument, in rebuttal, LPCF argued for the first time that the trial court committed legal error by admitting evidence of losses the plaintiffs sustained after their daughter's deathe.g., loss of services during Florean's bout with cancer and Booker's paraplegia rather than losses at the moment of death. The parties filed supplemental briefs on the issue. We are not persuaded that the admission of this evidence was legal error; certain elements of the wrongful death action necessarily arise after the victim's death. See, e.g., Taylor v. Giddens, 618 So.2d 834, 840 (La. 1993). Moreover, LPCF did not object to the introduction of this evidence at trial, to the opening and closing arguments, or to the form of the verdict, which referenced this evidence; LPCF also did not assign it as error. Under the circumstances, the issue is deemed abandoned and the interests of justice do not require addressing it. URCA Rules 2-12.4, 1-3; Haltom v. State Farm, 588 So.2d 792 (La.App. 2d Cir.1991); Smith v. Boothe, 28,065 (La.App.2d Cir.2/28/96), 669 So.2d 682, writ denied 96-0821 (La.5/10/96), 672 So.2d 928.