*514 KNOLL, JUSTICE
| tThis civil case presents the singular, res nova issue of whether a claim for negligent credentialing falls within the purview of the Louisiana Medical Malpractice Act (LMMA) and is, therefore, subject to its statutory cap on damages. After completion of the medical review process, plaintiffs, Brandi, Veronica, and Joseph Billeaudeau (collectively plaintiffs), proceeded in their suit against Opelousas General Hospital Authority (OGH), among other defendants, for injuries sustained by Brandi allegedly arising from the medical malpractice of Dr. Kondilo Skirlis-Zavala, an independent contractor working in the OGH’s emergency department (ED). Along with their medical malpractice claims, plaintiffs specifically alleged OGH was negligent in credentialing Dr. Zavala and subsequently moved for partial summary judgment, seeking a determination that their negligent credentialing claim was not subject to the LMMA’s cap on damages.
The District Court granted the motion and ultimately certified the judgment as final. After writ practice, the Court of Appeal, Third Circuit, affirmed on appeal. |2We granted writ to determine the correctness vel non of the lower courts’ finding claims of negligent credentialing are not claims of malpractice under the LMMA. Billeaudeau v. Opelousas General Hosp. Auth., 16-0846 (La. 6/28/16), 192 So.3d 781. For the following reasons, we find plaintiffs’ negligent credentialing claim sounds in general negligence and affirm the judgment of the Court of Appeal.
FACTS
On June 20, 2010, Brandi, a woman thirty-four years of age with Down syndrome, was taken to OGH by her parents, Veronica and Joseph Billeaudeau, after she collapsed at home. Upon arrival at the ED, Dr. Zavala diagnosed Brandi with focal motor seizure. Dr. Zavala ordered the administration of anti-seizure medication and a CT scan, which was reported as normal.
The Billeaudeaus disagreed with the doctor’s diagnosis. Thinking their daughter had suffered a stroke, they asked that Brandi be given tPA (t-plasminogen activator), a treatment for stroke victims. However, according to plaintiffs’ allegations, Dr. Zavala informed them their daughter was not a candidate for tPA. The Billeau-deaus then requested Brandi be transferred to Our Lady of Lourdes (OLOL) in Lafayette. Dr. Zavala arranged for Brandi’s transfer to OLOL, where she was given tPA over four hours after she suffered what was ultimately determined to be a stroke.[1] Brandi survived the stroke but unfortunately suffered severe, irreversible brain damage.
Veronica, individually and as Brandi’s curate, along with Joseph pursued a *515 claim under the LMMA and brought suit against OGH, among other defendants, specifically alleging:
Defendant, Opelousas General Hospital, is liable unto Petitioners because Ms. Billeaudeau’s injuries and damages, which |swill be specified hereinafter, were proximately and legally caused by the fault, including negligence, of Opel-ousas General Hospital and its officers, agents, employees, and those for whom it is legally responsible, including the following negligent acts of omission and commission, among others, which may be shown during the trial:
a. Failure to develop and/or implement adequate policies and procedures to competently address stroke and/or administration of tPA;
b. Failure to distribute its written stroke and/or tPA protocol to Dr. Kondilo Skirlis-Zavala, a physician working in the hospital’s emergency department;
c. Failure to ensure that Dr. Zavala had reviewed and accepted the hospital’s written stroke and/or tPA protocol;
d. Failure to supervise Dr. Zavala, a physician working in Opelousas General’s emergency department; and
e. Negligent credentialing of Dr. Za-vala.
Thereafter, plaintiffs filed a motion for partial summary judgment asking the District Court to declare their claim against OGH for negligent credentialing was not subject to the terms of the LMMA, including the cap on damages found in La. Rev. Stat. § 40:1231.2(B)(1).[2] OGH opposed the motion. At the hearing, plaintiffs presented their claim under La. Rev. Stat. § 40:2114(E), which mandates hospitals “establish rules, regulations, and procedures setting forth the nature, extent, and type of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein.” Pursuant thereto, plaintiffs argued OGH was negligent because Dr. Zavala “should not have been credentialed and ... given full active privileges at [OGH].” Simply put, she should not have been working in the ED, and thus, they argued this matter is one of “corporate malfeasance in the hiring process”:
[4... This is about whether this doctor, this particular doctor, based on her particular CV, and her particular CME [continuing medical education], and her particular experience and training, was qualified to be in the emergency room by that hospital....
... There’s a statutory obligation that the hospital has to not only establish bylaws and rules for the credentialing of its physicians, but also to follow them. And that statutory obligation is where the hospital’s duty that we’re alleging ... was breached ... [is] found. It’s not in the medical malpractice act. It’s 40:2114.
In opposition, OGH argued this case is based “upon a simple act of medical judgment”:
... The plaintiff wants to make it about ten thousand (10,000) other things, but this case is about a doctor, Dr. Zava-la, getting a patient in with an ongoing *516 stroke and making a medical judgment and determination whether or not that patient was eligible for tPA administration. That is it! The medical decision and medical judgment is at the heart of this case. ;
After taking the matter under advisement, the District Court granted plaintiffs’ motion. In its reasons for judgment, the District Court first examined the legislative history of the LMMA and its evolving definition of “malpractice,” particularly focusing on the Legislature’s failure to include “negligent hiring” within that definition despite four separate amendment attempts to do so:
In 2001, the Louisiana Legislature amended the definition of “malpractice” .to include “training and supervision of health care providers.” The Legislative history indicates that the original version of Senate Bill 713 sought to add negligent hiring and negligent retention to the definition of “malpractice” found under La. R.S. 40:1299.41.[3] However, the bill was amended to change “hiring” to “training” and inserted the phrase “or supervision of staff.”
[[Image here]]
In 2005, House Bill No. 257 (HB 257) sought to revise the definition of “malpractice” under the LMMA to specifically include “acts or omissions in a peer review process or the credentialing of a health care provider.” HB 257 failed to be passed by the Legislature.
In 2006, House Bill No. 260 (HB 260) sought to amend the definition of malpractice to again specifically include “acts or omissions in a peer review process or the credentialing of a health care provider.” HB 260 failed to be passed by the Legislature.
|nIn 2008, Senate Bill No. 509 (SB 509), Senate Bill No. 668 (SB 668), and House Bill No. 70 (HB 70) each sought to amend the definition of malpractice to specifically include “acts or omissions in the credentialing or re-credentialing of a health care provider.” None of these bills made it through the Legislature.
[[Image here]]
At this point, the doctrine of statutory construction Expressio Unius est Exclu-sio Alterius, would seem to apply. This maxim dictates that “when the legislature specifically enumerates a series of things, the legislature’s omission of other items, which could have easily been included in the statute, is deemed intentional.” While it is tempting to infer that the legislature intentionally and repeatedly omitted negligent hiring/credentialing from the definition of malpractice, La. R.S. 24:177[4] prevents the *517 undersigned from making such an inference.
JLs: •
Simply stated, those words and phrases in legislative bills that are amended out of legislative bills and those bills that do not make it into law are not competent evidence, proof or indicia of legislative intent under La. R.S. 24:177. Apparently the Legislature only wants courts to consider what it actually passes and not to infer legislative intent from those things that fail to become law. (Footnote added)
The District Court then applied the six factor test set forth by this Court in Coleman v. Deno, 01-1517 (La. 1/25/02), 813 So.2d 303, to determine whether negligent credentialing falls within the definition of “malpractice” as enacted under the LMMA, concluding:
As stated above, the undersigned considers this case to be a “close call.” It is hard for this court to overlook the fact that the LMMA’s definition of “malpractice” does not specifically include negligent credentialing of a healthcare provider. The statute is clear and unambiguous. It is also difficult for this court to overlook the fact that the Legislature has tried to amend the definition of malpractice to include negligent credentialing or negligent hiring on at least four (4) occasions—and all attempts were unsuccessful. “[I]t is not the function of the judicial branch in a civilian legal system to legislate by inserting ... provisions into statutes where the legislature has chosen not to do so.”
On the other hand, this court is apparently bound to apply the Coleman v. *518 Deno factors. In this court’s opinion, the Coleman v. Deno factors can be convincingly argued to suit either party’s purpose in any given case. Further it is not clear whether all of the factors need to be met in order to constitute “malpractice.” If it is not necessary that all of the factors be met, then how many factors must be met before the alleged act or omission constitutes malpractice? Therefore, this court finds the Coleman v. Deno factors can be ambiguous.
[[Image here]]
... [I]n accordance with the Supreme Court’s instructions in LaCoste [v. Pendleton Methodist Hosp., L.L.C., 07-0008 (La. 9/5/07), 966 So.2d 519, 524] and other cases, the ambiguity is resolved in favor of the Plaintiff and against finding that the tort of negligent credentialing sounds in medical malpractice.... While a hospital’s |7decision to hire or grant privileges to a physician is an important administrative decision that affects the quality of treatment a patient receives, it is simply not the same as other purely medical decisions made by physicians during the course of a patient’s treatment, such as deciding whether to recommend surgery, whether to order diagnostic testing, or which medicine to prescribe.
OGH sought a writ of supervisory review from the Court of Appeal, Third Circuit, which was denied. Billeaudeau v. SJcirlis-Zavala, 15-821 (La. App. 3 Cir. 9/28/15) (unpublished).[5] This Court likewise denied writ with Justice Guidry concurring “in the writ denial because the issue is to be considered on the merits in the pending appeal.” Billeaudeau v. Skir-lis-Zavala, 15-1948 (La. 11/30/15), 182 So.3d 43. Meanwhile, the District Court certified its grant of partial summary judgment as a final judgment.
On appeal, the appellate court, applying the law of case doctrine, found no palpable error in its previous denial of supervisory writs and affirmed the judgment of the District Court.[6] Billeaudeau v. Opelousas General Hosp, Auth., 15-10341 s(La.App. 3 *519 Cir. 4/6/16), 189 So.3d 561.[7] While its analysis of the Coleman factors differed slightly from that of the lower court, the Court of Appeal nevertheless found the claim for negligent credentialing was not a claim of malpractice under the LMMA under the Coleman framework. It also took into consideration the legislative history of the LMMA—particularly the failure of each bill drafted to include “credentialing” in the definition of “malpractice”—concluding: “We will not create law by judicial fiat when, as here, the legislature clearly failed to do so.”
In his dissent, Judge Gremillion opined “the fact that the damages were caused by alleged malpractice and not the credentialing of a physician should end the analysis.” Regardless, Judge Gremillion employed his own analysis of the Coleman factors, which ultimately rejected the majority’s conclusion and brought him again to his first proposition:
Simply allowing a bad doctor access to patients at your hospital, without more, gets a plaintiff nowhere. It is only when that bad doctor does bad things to a patient, and those bad things result in damages, that a patient may recover.
He also rejected the appellate majority’s interpretation of the amendments, or rather lack thereof, to the LMMA, reasoning one could just as easily conclude the Legislature felt the inclusion of credentialing was unnecessary because the act of hiring is an act of supervision, explicitly covered in the LMMA.
Plaintiffs have now settled their medical malpractice claims against OGH, solely reserving for review the proper classification of their negligent credentialing |flclaim.[8] Accordingly, the only issue presented to this Court is whether plaintiffs’ credentialing claim sounds in medical malpractice or in general negligence.[9]
*520 DISCUSSION
This matter comes before us on a motion for summary judgment, which was granted and affirmed. Appellate review of the granting of a motion for summary judgment is de novo, using the identical criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Bonin v. Westport Ins. Corp., 05-0886, p. 4 (La. 5/17/06), 930 So.2d 906, 910. A motion for summary judgment shall be granted if “the motion, memorandum, and supporting documents show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law.” La. Code Civ. Proc. art. 966(A)(3). When summary judgment is granted in the context of statutory interpretation, there are no material issues of fact in dispute, and the sole issue before the reviewing court is a question | inof law as to the correct interpretation of the statute at issue. Vizzi v. Lafayette City-Parish Consol. Government, 11-2648, p. 2 (La. 7/2/12), 93 So.3d 1260, 1262.
In them motion, plaintiffs did not seek summary judgment on the merits of their claim, but rather on whether negligent credentialing is covered by the LMMA. Accordingly, as the District Court correctly found, this matter is one of statutory interpretation. Specifically, we are asked to interpret the LMMA’s definition of “malpractice” and determine whether negligent credentialing claims are included in that definition.
Under the general rules of statutory construction, the interpretation of any statutory provision begins with the language of the statute itself. McGlothlin v. Christus St. Patrick Hosp., 10-2775, p. 11 (La. 7/1/11), 65 So.3d 1218, 1227. When the provision is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. La. Civ. Code art. 9; La. Rev. Stat. § 1:4; Milbert v. Answering Bureau, Inc., 13-0022 (La. 6/28/13), 120 So.3d 678, 684. Unequivocal provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. La. Civ. Code art. 11; La. Rev. Stat. § 1:3; see also Snowton v. Sewerage and Water Bd., 08-0399, pp. 5-6 (La. 3/17/09), 6 So.3d 164, 168.
Moreover, this court has, without exception, emphasized that the LMMA and its limitations on tort liability for a qualified health care provider apply strictly to claims “arising from medical malpractice.” Coleman v. Deno, 01-1517, pp. 15-16 (La. 1/25/02), 813 So.2d 303, 315. This is so because the LMMA’s limitations on the liability of health care providers are special legislation in derogation of the rights of tort victims, and as such, the coverage of the act should be strictly |nconstrued. Sewell v. Doctors Hospital, 600 So.2d 577, 578 (La. 1992). “The primary limiting provisions available to private health care providers are the maximum amount of damages and the mandatory pre-suit review by a medical review panel, along with the special prescriptive and peremptive periods for malpractice actions.” Spradlin v. Acadiar-St. Landry Medical Foundation, 98-1977, p. 6 (La. 2/29/00), 758 So.2d 116, 120. These limitations apply only in cases of liability for malpractice as defined in the LMMA, and any other liability of the health care provider is governed by general tort law. Williamson v. Hospital Service Dist. No. 1 of Jefferson, 04-0451, p. 5 (La. 12/1/04), 888 So.2d 782, 786.
The LMMA defines “malpractice” ⅞¾
*521 ... any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts- or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.
La. Rev. Stat. § 40:1299.41(A)(8).
Although the statutory provision clearly covers negligent “training and supervision of health care providers,” it does not directly address negligence in the credentialing or hiring of said providers, However, while the term “negligent credentialing’' is not explicitly provided for within the LMMA, our inquiry does not end there.
Rather, the general definition of “malpractice” recited above focuses on conduct. Cognizant of this, the Court in Coleman set forth six factors to assist a court in determining whether certain conduct by a qualified health care provider constitutes “malpractice” as defined under the LMMA:
| ia(l) Whether the particular wrong is “treatment related” or caused by a dereliction of professional skill,
(2) Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,
(3) whether the pertinent act or omission involved assessment of the patient’s condition,
(4) whether an incident occurred in the context of a physician-patient, relationship, or was. within the scope of activities which a hospital -is licensed to perform,
(5) whether the injury would have occurred if the patient had not sought treatment, and ; ,
(6) whether the toft alleged was intentional. ■ ■ ■ ■
Coleman, 01-1517 at pp. 17-18, 813 So.2d at 315-16.
Generally this issue would present on an exception of prematurity, and a court in its trial of the exception would analyze the allegations of the petition under Coleman to determine whether they sound in medical malpractice and, thus,- must proceed in accordance with the LMMA, or sound in general negligence and, thus, should proceed under general tort law. Belvin v. Hamilton Medical Center, Inc., 07-0127, p. 7 (La. 6/29/07), 959 So.2d 440, 445. Although this matter is on summary judgment, it still logically follows a- court must analyze plaintiffs’ claims under the Cole-mom factors, as the lower, courts did herein, to determine whether they sound in medical malpractice or general negligence. Accordingly, we must apply the Coleman factors to the negligent credentialing allegations, to determine whether, this claim falls outside the. LMMA. and, therefore, would entitle plaintiffs to sumrnaryJudgment as a matter of law.
As recited above, plaintiffs ■ specifically alleged in their petition that OGH was negligent in credentialing -Dr. Zavala. In their motion for summary.judgment/, plains tiffs expounded upon that allegation, crouching OGH’s. decision to grant credentials to Dr. Zavala in terms óf an adminfer trative decision, not a medical one. They further argued OGH was negligent in:.
|1R(1) allowing Dr. Zavala to have privileges in its ED because she lacked the *522 experience and training required by OGH’s own by-laws governing the granting of privileges, namely she had not been working full-time in an ED for at least one year prior to receiving privileges;
(2) failing to follow up on a “qualified” reference given by an emergency medicine physician at the time Dr. Zavala was granted privileges;
(3) failing to investigate two malpractice claims filed against Dr. Zavala before she sought privileges at OGH.
(4) failing to investigate Dr. Zavala’s failure to produce evidence she had completed CME in emergency medicine training (also required by OGH’s by-laws).
With these arguments and allegations in mind, we turn now to an application of the Coleman factors.

(1) Whether the particular wrong is “treatment related” or caused by a dereliction of professional skill?

Analyzing this factor, the District Court reasoned the scope of the duty to select competent physicians is to ensure a hospital’s patients receive proper medical treatment. While the credentialing of physicians is an independent, non-medical act that is administrative or managerial in nature, the District Court nevertheless found “it is inseparable from its ultimate purpose—to ensure that patients receive quality of medical care and treatment during their hospital visit or confinement.” Therefore according to the District Court, the breach of a hospital’s duty to select competent physicians with reasonable care does, at least partially, involve “treatment of the patient” and “health care,” satisfying this factor.
All three judges composing the appellate panel disagreed. The majority along with the dissenting judge all agreed this case does not require the court to review the treatment of Brandi in determining whether OGH was negligent in hiring Dr. Zava-la.
In line with the District Court’s reasoning, OGH argues the decision to extend privileges in the first instance may not be temporally related to the 114individual treatment the professional may deliver in the future—when the patient presents herself to the ED for treatment—but it seems obvious both the initial decision to extend privileges and subsequent decisions to renew or retain such privileges, in light of known malpractice claims against the physician, necessarily involve the assessment of that physician’s qualifications and abilities to render health care and provide medical treatment. For support, OGH looks to this Court’s recent decision in Dupuy v. NMC Operating Co., LLC, 15-1754 (La. 3/15/16), 187 So.3d 436, where we determined a hospital’s negligence in maintaining and servicing equipment utilized in the sterilization of surgical instruments fell within the LMMA. In so concluding, we reasoned “there is no requirement that an action must be contemporaneous with a patient’s treatment in order to fall under the MMA.” Dupuy, 15-1754 at p. 10, 187 So.3d at 442. We further extrapolated:
... The use of the broad term “health care provider,” rather than simply “physician” or “medical doctor,” necessarily includes actions which are treatment related and undertaken by the Hospital in its capacity as a health care provider— even if those actions are not performed directly by a medical professional.
Id. at p. 11, 187 So.3d at 443. Relying on this reasoning, OGH now argues exposing future patients to allegedly unqualified physicians with ED privileges seems to be even more fundamentally related to medi *523 cal treatment than exposing future patients to unsterilized medical equipment. And further it seems apparent to OGH the decisions made by members of a hospital’s credentialing committee, whether those members are physicians or not, bear fundamentally on the “health care” being offered by the hospital through the physicians they employ or credential.
Contrarily, plaintiffs argue negligent credentialing is not an activity that is “treatment related” within the meaning of the LMMA, nor does this activity involve a dereliction of professional medical skill, like the failure to perform | ^medical care or treatment properly. Plaintiffs distinguish Dupuy, which concerned the failure to disinfect medical equipment used in that particular patient-plaintiffs surgical procedure. By contrast, plaintiffs claim Dr. Za-vala’s negligent credentialing was not specific to Brandi and did not occur during her care, treatment, or confinement. That is, Dr. Zavala’s credentialing, was not a “preliminary safeguard” rendered before Brandi’s specific treatment in the ED, like the disinfection process utilized in Dupuy. Rather, plaintiffs rely upon this Court’s holding in Williamson wherein we decided a hospital’s alleged negligence in failing to repair a wheelchair and to make sure it was in proper working condition before returning it to service was neither “treatment related” nor caused by a dereliction of “professional skill” as the wrongs alleged were “not directly related to, nor [did] they involve, treatment of this patient.” 04-0451 at p. 12, 888 So.2d at 790. Plaintiffs likewise rely upon LaCoste v. Pendleton Methodist Hospital, LLC, 07-0008 (La. 9/5/07), 966 So.2d 519, 526, and the holding of this Court that a hospital’s negligent administrative decisions—in failing to (1) design, construct, and/or maintain its facility to provide emergency power to sustain life support systems during and in the aftermath of Hurricane Katrina, (2) implement adequate evacuation plans, and (3) have facilities available to transfer patients in emergency or mandatory evacuations—did not relate to medical treatment or a dereliction of professional skill within the meaning of this factor. 07-0008 at pp. 9-10, 966 So.2d at 525-26.
As the District Court noted, this factor can be artfully argued either way. But while the staffing of a hospital does in some aspects involve the degree and quality of the health care provided by the hospital, the decision to hire a physician in and of itself is administrative and does not directly relate to the treatment of any given patient or involve a dereliction of professional skill. Though credentialing 11fiallows a physician access to the hospital, the treatment-related medical decisions and dereliction of skill with which the LMMA is concerned, and for which a hospital can be held liable for “malpractice,” fall under the “supervision and training of the health care providers” once they enter the building and engage in the practice of medicine therein. Therefore, under this factor, a claim for negligent credentialing, separate and distinct from a claim for negligent supervision, weighs in favor of our finding general negligence more so than malpractice.

(2) Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached?

With respect to this second factor, the District Court reasoned that while there was a certain level of professional skill associated with credentialing, this evidence likely deals more "with hospital administration, hospital policies and procedures, and physician credentialing policies and procedures as opposed to actual medical issues. Nevertheless, the District Court concluded this factor was satisfied because the jury *524 may need expert testimony to explain the standard .of care, though not necessarily a medical expert. The appellate court agreed with the:,lower court that this factor weighs in favor of finding the claim sounds in malpractice, but it also emphasized the expert evidence or testimony is not medical because the applicable standard of care is not the proper administration of tPA, but the hospital’s decision-making process in evaluating, qualifications necessary to work as an ED doctor.
■ OGH once again relies on our holding in Dupuy, arguing that while jurors might be able to conclude physicians should be properly qualified before a hospital extends them ED privileges, medical expertise will be necessary to establish whether Dr. Za-vala was in fact properly qualified for the job. Plaintiffs, on the other hand, argue expert medical evidence is clearly not required to explain to |17laypersons that OGH negligently credentialed Dr. Zavala to work as an emergency medicine physician at its hospital. According to plaintiffs, the credentialing function is administrative in nature and concerns adherence to a hospital’s bylaws; it does not involve intricate medical issues that laypersons will find difficult to understand, such as the standard of care for performing a surgical procedure. In support of their position, plaintiffs direct the Court’s attention to the medical review panel process required for all malpractice claims under the LMMA and argue such a panel in a credentialing case could not be composed of healthcare providers because the individuals with knowledge of the duty of care required in credentialing are all medical staff employees who are not licensed to practice medir cine. They also rely upon LaCoste, particularly our finding a hospital’s failure to formulate and execute properly an evacuation plan was not malpractice even though the duty of care required experts to explain technical, as distinguished from medical, terms.
Unlike the lower courts, we do not believe this factor weighs in favor of malpractice. While the standard of care may very well require expert testimony, that testimony is' not of the medical nature required in Dupuy to determine “whether [surgical] instruments were in fact properly sterilized” before surgery. Dupuy, 15-1754 at p. 12, 187 So.3d at 443. Therein, plaintiffs would be required to present medical experts to explain what the protocol for such maintenance entailed and the necessity of following that protocol. Id. Herein, plaintiffs are alleging a breach of this particular hospital’s by-laws and administrative procedures, not nationally recognized sterility standards. While a combination of fact and expert witnesses will most likely'be necessary to aid the jury in understanding the hospital’s policies and procedures in credentialing its physicians in order to determine whether the hospital breached the duties imposed therein—the specific |, «wrong alleged in this case—, expert medical evidence is not necessary to establish the breach in this case. Therefore, this factor as well falls in favor of finding the claim sounds in general negligence.

(3) Whether the pertinent act or omission involved assessment of the patient’s condition?

As to this factor, the District Court found it difficult to say whether this factor applies to the instant case because while the act of negligent credentialing by itself does not involve, assessment of the patient’s condition, a -hospital should ensure the physician has the ability to assess those conditions he/she is likely to be presented with in an ED setting before credentialing the physician. The appellate court, however, succinctly found an analy *525 sis of OGH’s credentialing methods as.they relate to Dr. Zavala would not require any assessment of Brandi’s condition.
Citing again Dwpuy’s observation that negligent conduct need not be contemporaneous with a patient’s treatment to fall under the LMMA, ÓGH presents an argument in line with the District Court’s reasoning: “It seems obvious that entrusting patients to physicians with emergency room privileges necessarily involves some anticipation of the treatment likely to be needed for patients seeking emergency care and an assessment of the physician’s training and ability to ‘render’ and ‘render timely5 that ‘health care’ likely to be needed.” In opposition, plaintiffs assert OGH’s negligent decision to credential Dr. Zavala was not based on any individual medical assessment but father, was an administrative decision made by OGH’s Board of Directors, months before Brandi ever presented for treatment.
Our analysis of this factor coincides with that of the appellate court. The administrative decision to credential Dr. Zavala did not involve the “assessment of the patient’s [Brandi’s] condition,” or the actual medical assessment of any 119patient’s condition. Consequently, this factor likewise mitigates against a finding of malpractice.

(4) Whether the incident occurred in the context of a. physician/patient relationship, or was within the scope of activities which a hospital is licensed to perform?

As both lower courts correctly noted, credentialing is within the scope of activities a hospital is licensed to perform, specifically under La. Rev. Stat. § 40:2114(E), which provides: “A hospital.shall establish rules, regulations, and procedures setting forth the nature, extent, and type of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein.” Accordingly, regardless of the plaintiffs’ arguments that this matter does not occur in the context of a physician/patient relationship, this factor clearly applies in this case and weighs in favor of finding this matter falls within the LMMA.[10]
(5) Whether the injury would have occurred if the patient had not sought treatment? . ,
The District Court found this factor-was also difficult to apply in this case. As the court explained, plaintiffs contend Brandi presented to the ED with symptoms of a stroke. Brandi needed treatment from a medical professional regardless of whether *526 it was OGH and Dr. Zavala or someone else. Plaintiffs Uallege Dr. Zavala did not diagnose those symptoms in a timely manner and failed to treat the stroke properly. Essentially, they are asserting (1) the effects of the stroke may not have been as severe had Dr. Zavala properly diagnosed and treated the stroke, and (2) the damages would not have occurred but for OGH eredentialing Dr. Zavala, who they contend was not qualified to be an ED physician.
The Court of Appeal found plaintiffs contentions “a peculiarly circular type of analysis.” While Brandi’s alleged injuries relate to the treatment provided by Dr. Zavala, the eredentialing decisions of OGH were not necessarily tied to the treatment of Brandi. And though agreeing this factor was difficult to apply, the appellate court concluded it weighs against treating the claim as malpractice.
According to OGH, this factor is satisfied because the gravamen of plaintiffs’ injury claims is that Brandi would not have suffered injury but for Dr. Zavala’s alleged malpractice in failing to timely diagnose stroke or administer tPA and that Brandi might very well have received the proper treatment she needed had OGH not granted or retained Dr. Zavala’s ED privilege. Plaintiffs concede by necessity Brandi’s injuries would not have occurred had she not presented to OGH for treatment, but argue this is why the Coleman factors must be examined in their totality. In this vein, plaintiffs advance the LaCoste court’s instruction to focus on whether the injury is related to “medical treatment” as a “but for rationale may be overly facile when considering this factor.” LaCoste, 07-0008 at p. 15, 966 So.2d at 5⅞9. Styled in such light, OGH’s negligent eredentialing of Dr. Zavala cannot constitute “medical treatment” within the meaning of this factor, and so according to plaintiffs, it is not helpful to the analysis.
In analyzing this factor, we take particular guidance from our holding in LaCoste, where we explained:
|g1This factor is somewhat difficult to evaluate in the context of the factual allegations in this particular case. The defendant argues that the thrust of the plaintiffs’ petition is that Mrs. LaCoste did not receive the treatment she was presumably seeking when she presented herself to the hospital. Thus, the defendant asserts, this is a claim for an injury unique to Mrs. LaCoste’s status as a patient. The plaintiffs rely on this court’s caution in Williamson that a “but for” rationale may be overly facile when considering this factor. 04-0451, p. 14, 888 So.2d at 790. In a general sense, any wrong that a patient suffers in a hospital or doctor’s office would not occur if the patient had not first entered the facility. Yet, many claims of medical malpractice resulting from omissions might not qualify as medical malpractice if this factor were applied singly and without relation to the other Coleman factors, because an omission, such as a failure to diagnose, ostensibly leaves a patient in the same position as she would have been in had she never sought treatment in the first place. The defendant’s argument that this is a “failure to treat” case is subsumed in the first factor, which considers whether the particular wrong is treatment related or the result of a dereliction of professional skill[.] Given that we have found that the particular wrongs alleged in the petition as amended were neither treatment related nor the result of a dereliction of professional medical skill, the possibility that, had she not been admitted to the hospital, Mrs. LaCoste might have lived or, conversely, that she would have nevertheless died as a result of her pneumonia, or even that her condition would have *527 remained the same, does not weigh greatly in favor of finding that the wrongful conduct alleged in the petition as amended was medical malpractice within the confines of the LMMA.
LaCoste, 07-0008 at pp. 15-16, 966 So.2d at 528-29. Notably, LaCoste involved the failure of a life support system that was far more integral to the patient’s care and treatment than the administrative decision to hire a physician herein, which we have already found in our first factor analysis is not treatment related. Therefore, we find this factor likewise does not weigh greatly in favor of finding the negligent credentialing alleged in the petition was medical malpractice under the LMMA.

(6) Whether the alleged tort was intentional?

Both the lower courts and the parties agree this factor is not in issue as plaintiffs do not allege any intentional torts.
Repeatedly we have cautioned “[a]n expansive reading of the definition of medical malpractice contained in the MMA runs counter to our previous holdings [ 22that coverage of the Medical Malpractice Act should be strictly construed....” Williamson, 04-0451 at p. 8, 888 So.2d at 787. Although OGH asserts plaintiffs’ claims sound in medical malpractice or are so intertwined with their settled medical malpractice claims they cannot be severed from those claims, particularly the negligent supervision claims, we find the application of the Coleman factors demonstrate the alleged negligent credentialing was administrative, not medical, in nature. Consequently, the tortious conduct alleged herein, i.e., OGH’s negligent administrative decision making, is separate and distinct from the medical decisions and conduct directly related and integral to the rendering of medical care and treatment by the health care providers to the patient in this case, ie., the medical malpractice covered by and to subject to’ the LMMA.
As we explained in Coleman, only plaintiffs’ claims “arising from medical malpractice” are governed by the LMMA, and all other tort liability on the part of the qualified health care provider is governed by general tort law. Thus, plaintiffs’ negligent credentialing claim is not entitled to the limitations on liability contained in the LMMA and should, as 'the lower courts determined, proceed in accordance with general tort law.
Accordingly under the Coleman test, plaintiffs’ negligent credentialing claim is weighted in favor of our finding the claim sounds in general negligence and falls outside the purview of the LMMA and its limitations on liability. We find, therefore, plaintiffs are entitled to summary judgment on this issue as a matter of law.
CONCLUSION
With the assistance of the Coleman factors, we have applied the LMMA’s definition of medical malpractice to plaintiffs’ negligent credentialing claim, and l^we conclude this claim does not fall within the provisions of the LMMA. Accordingly, we affirm the judgment of the Court of Appeal.
DECREE
For these reasons, we hereby affirm the judgment of the Court of Appeal.
AFFIRMED.

. As noted by the parties in brief, this was outside the three to four hour window of tPA’s efficacy.

. La. Rev. Stat. § 40:1231.2(B)(1) provides: "The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost."

3. La. Rev. Stat. § 40:1299.41 was redesignat-ed to La. Rev. Stat. § 40:1231.1 by House Concurrent Resolution No, 84 of the 2015 Regular Session. For consistency, -we will refer to this provision by its prior designation.

4. La, Rev. Stat. § 24:177 provides:
A. When the. meaning of a law cannot be ascertained by the application of the provisions of Chapter 2 of the Preliminary Title of the Louisiana Civil Code and Chapter 1 of Title 1 of the Louisiana Revised Statutes of 1950, the court shall consider the intent of the legislature.
B.(l) The text of a law is the best evidence of legislative intent.
(2)(a) The occasion and necessity for the law, the circumstances under which it was enacted, concepts of reasonableness, and contemporaneous legislative history may also be considered in determining legislative intent,
(b) The legislature may express the intended meaning of a law in a duly adopted concurrent resolution, by the same vote and, except for gubernatorial veto and time limitations for introduction, according to the same procedures and formalities required for enactment of that law.
C.The legislature is presumed to have enacted an article or statute in light of the preceding law involving the same subject *517 matter and court decisions construing those articles or statutes, and where the new article or statute is worded differently from the preceding law, the legislature is presumed to have intended to change the law.
D. A bill introduced but which does not become law is not competent evidence of legislative intent. Any action by the legislature other than enactment of law or adoption of a resolution as provided in Subpara-graph (B)(2)(b) of this Section shall not constitute a confession as to the meaning of the law extant.
E.(l) The keyword, one-liner, summary and adjoining information, abstract, digest, and other words and phrases contained outside the sections of a bill following the enacting clause are solely to provide the members of the legislature with general in-dicia of the content of the bill and are not subject to amendment by the legislature or any committee of the legislature and shall not constitute proof or indicia of legislative intent.
■(2) Fiscal and actuarial notes provide the legislature with an analysis of the potential fiscal impact of a bill based on presumptions made by the legislative fiscal officer, actuary, economist, or analyst preparing the note and shall not constitute proof or indicia of legislative intent.
(3) Committee minutes are summary reports of committee proceedings and shall not constitute proof or indicia of legislative intent.
(4) Words and phrases not constituting the substance of an amendment or the recommendations of a conference committee report, and any other legislative staff documents which are not subject to amendment by the legislature or any committee of the legislature, shall not constitute proof or in-dicia of legislative intent.
With all due deference to our legislative colleagues, we note while the enactment of laws falls within the sound discretion of the legislative branch, interpretation of those laws fall within the province of the judicial branch. Unwired Telecom Corp. v. Parish of Calcasieu, 03-0732, p. 16 (La. 1/19/05), 903 So.2d 392, 404 ("The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of government. ... [Interpreting the law is the designated function of the judiciary, not the Legislature.”). We have also long held: "[i]n many cases, the legislative history of an act and contemporaneous circumstances may be helpful guides in ascertaining legislative intent.” Exxon Pipeline Co. v. Louisiana Public Service Com’n, 98-1737, p. 9 (La. 3/2/99), 728 So.2d 855, 860.

. The appellate court panel, composed of Judges Peters, Amy, and Savoie with all three signing, originally issued the following ruling on September 25, 2015: 'WRIT DENIED. We find no error in the trial court’s ruling.” The panel then issued a revised ruling signed by Judge Savoie on September 28, 2015, stating simply: "WRIT DENIED.” The revised ruling also contained, the following notations reflecting the votes of the two remaining judges:
Peters, J., concurs, finding no error in the trial court’s ruling.
Amy, J., dissents and would grant the writ.

. Interestingly, OGH challenges in this Court the appellate court's application of the law of the case doctrine. As learned jurist, Albert A. Tate, Jr., explained when organ for the Court in Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971):
With regard to an appellate court, the 'law of the case’ refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.
Day, 256 So.2d at 107. In its arguably erroneous, but harmless adherence to this doctrine, the appellate court engaged in a proper ¡fe *519 novo review to ascertaining whether the prior panel had committed palpable error in its writ denial. Therefore, we see no need to further expound upon Justice Tate's recitation of this doctrine and pretermit discussion of this assignment of error accordingly.

. The panel on appeal was composed of Judges Pickett, Genovese, and Gremillion.

. In its "Order and Reasons for Certifying a Partial Summary Judgment as a Final Appeal-able Judgment," the District Court explained:
Since rendering that Partial Summary Judgment, the Plaintiffs’ medical malpractice claims against the Defendants, Dr. Kondilo Skirlis-Zavala and Opelousas General Hospital, have been resolved, with Plaintiffs reserving their rights to seek excess damages against the Louisiana Patient’s Compensation Fund. In addition, Plaintiffs have expressly reserved their right to pursue their negligent credentialing claim against Opelousas General Hospital.

. Although OGH asserts there is a split in the circuits on this very issue, we note the circuit cases to which OGH refers all involved mixed allegations of negligent credentialing and supervision or strictly negligent supervision claims and, thus, are clearly distinguishable from the present case, which currently proceeds in this Court strictly on negligent credentialing. See Talbert v. Evans, 11-1096 (La. App. 4 Cir. 3/7/12), 88 So.3d 673; Plaisance v. Our Lady of Lourdes Regional Med. Ctr., Inc., 10-348 (La.App. 3 Cir. 10/6/10), 47 So.3d 17; Dinnat v. Texada, 09-665 (La.App. 3 Cir. 10/6/10), 30 So.3d 1139; Bickham v. Inphynet, Inc., 03-1897 (La. 8/24/04), 899 So.2d 15. Moreover, OGH claims Gladney v. Sneed, 32,-107, p. 5 (La,App. 2 Cir. 8/18/99), 742 So.2d 642, 647, affirmed without discussion the application of the LMMA to a negligent credentialing claim in which a jury concluded the defendant hospital "breached its own credentialing procedures in hiring a physician [a second-year pediatric resident] who lacked the necessary training, expertise, or demonstrated competence to work the ER.” Id. Significantly, however, the appellate court actually stated that “[tjhe jury could reasonably find that the breach of credentialing created an environment ripe for malpractice," not that the negligent credentialing was malpractice. Id. We further note Gladney likewise involved numerous allegations of malpractice *520 against the hospital and its staff, not just credentialing.

. Notably, amicus curiae, and plaintiffs to an extent, attempt to cast the issue strictly within the confines of La, Rev. Stat. §’ 40:2114 and argue any discussion of "malpractice” is misplaced because this provision (1) numerically falls outside the LMMA, La. Rev. Stat, § 40:1299.41 et seq., and (2) imposes an “affirmative, statutory duty to hire and allow privileges only to competent, able physicians.” However, this particular Coleman factor expressly brings credentialing within the perimeters of our LMMA "malpractice” discussion/analysis as it falls “within the scope of activities which a hospital is licensed to perform,” Further, the very definition of “malpractice," specifically includes "all legal responsibility of the health care provider." And "tort” is defined as “any breach of duty,” La, Rev. Stat. § 40:1299.41(A)(7). Amicus also argues credentialing does not constitute "health care” -as defined by the LMMA to mean “any act or treatment performed, or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient’s medical care, treatment, or. confinement.” La. Rev. Stat. § 40:1299.41(A)(9). Because our Coleman analysis is dispositive, we pretermit any discussion of this interpretation of "health care” or how such an interpretation would affect our holding in Dupuy.