# Supreme Court of Louisiana

The Opinions handed down on the **19th day of October, 2016**, are as follows:

**BY KNOLL, J.**:

2016-C -0846        BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU, AND JOSEPH BILLEAUDEAU
                    v. OPELOUSAS GENERAL HOSPITAL AUTHORITY, DR. KONDILO SKIRLIS-
                    ZAVALA, AND THE SHUMACHER GROUP OF LOUISIANA, INC. (Parish of St.
                    Landry)

                    For these reasons, we hereby affirm the judgment of the Court of
                    Appeal.
                    AFFIRMED.

                    JOHNSON, C.J., dissents and assigns reasons.
                    WEIMER, J., concurs and assigns reasons.
                    GUIDRY, J., dissents and assigns reasons.
                    CLARK, J., dissents for the reasons assigned by J. Guidry and
                    assigns additional reasons.

SUPREME COURT OF LOUISIANA

NO. 2016-C-0846

BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU, AND JOSEPH BILLEAUDEAU

VERSUS

OPELOUSAS GENERAL HOSPITAL AUTHORITY, DR. KONDILO SKIRLIS-ZAVALA, AND THE SHUMACHER GROUP OF LOUISIANA, INC.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF ST. LANDRY

KNOLL, JUSTICE

This civil case presents the singular, *res nova* issue of whether a claim for negligent credentialing falls within the purview of the Louisiana Medical Malpractice Act (LMMA) and is, therefore, subject to its statutory cap on damages. After completion of the medical review process, plaintiffs, Brandi, Veronica, and Joseph Billeaudeau (collectively plaintiffs), proceeded in their suit against Opelousas General Hospital Authority (OGH), among other defendants, for injuries sustained by Brandi allegedly arising from the medical malpractice of Dr. Kondilo Skirlis-Zavala, an independent contractor working in the OGH's emergency department (ED). Along with their medical malpractice claims, plaintiffs specifically alleged OGH was negligent in credentialing Dr. Zavala and subsequently moved for partial summary judgment, seeking a determination that their negligent credentialing claim was not subject to the LMMA's cap on damages.

The District Court granted the motion and ultimately certified the judgment as final. After writ practice, the Court of Appeal, Third Circuit, affirmed on appeal.

We granted writ to determine the correctness *vel non* of the lower courts' finding claims of negligent credentialing are not claims of malpractice under the LMMA. *Billeaudeau v. Opelousas General Hosp. Auth.*, 16-0846 (La. 6/28/16), 192 So.3d 781. For the following reasons, we find plaintiffs' negligent credentialing claim sounds in general negligence and affirm the judgment of the Court of Appeal.

## FACTS

On June 20, 2010, Brandi, a woman thirty-four years of age with Down syndrome, was taken to OGH by her parents, Veronica and Joseph Billeaudeau, after she collapsed at home. Upon arrival at the ED, Dr. Zavala diagnosed Brandi with focal motor seizure. Dr. Zavala ordered the administration of anti-seizure medication and a CT scan, which was reported as normal.

The Billeaudeaus disagreed with the doctor's diagnosis. Thinking their daughter had suffered a stroke, they asked that Brandi be given tPA (t-plasminogen activator), a treatment for stroke victims. However, according to plaintiffs' allegations, Dr. Zavala informed them their daughter was not a candidate for tPA. The Billeaudeaus then requested Brandi be transferred to Our Lady of Lourdes (OLOL) in Lafayette. Dr. Zavala arranged for Brandi's transfer to OLOL, where she was given tPA over four hours after she suffered what was ultimately determined to be a stroke.[1] Brandi survived the stroke but unfortunately suffered severe, irreversible brain damage.

Veronica, individually and as Brandi's curatrix, along with Joseph pursued a claim under the LMMA and brought suit against OGH, among other defendants, specifically alleging:

> Defendant, Opelousas General Hospital, is liable unto Petitioners because Ms. Billeaudeau's injuries and damages, which

---

[1] As noted by the parties in brief, this was outside the three to four hour window of tPA's efficacy.

2

will be specified hereinafter, were proximately and legally caused by the fault, including negligence, of Opelousas General Hospital and its officers, agents, employees, and those for whom it is legally responsible, including the following negligent acts of omission and commission, among others, which may be shown during the trial:

a.  Failure to develop and/or implement adequate policies and procedures to competently address stroke and/or administration of tPA;

b.  Failure to distribute its written stroke and/or tPA protocol to Dr. Kondilo Skirlis-Zavala, a physician working in the hospital's emergency department;

c.  Failure to ensure that Dr. Zavala had reviewed and accepted the hospital's written stroke and/or tPA protocol;

d.  Failure to supervise Dr. Zavala, a physician working in Opelousas General's emergency department; and

e.  Negligent credentialing of Dr. Zavala.

Thereafter, plaintiffs filed a motion for partial summary judgment asking the District Court to declare their claim against OGH for negligent credentialing was not subject to the terms of the LMMA, including the cap on damages found in La. Rev. Stat. § 40:1231.2(B)(1).[2]  OGH opposed the motion.  At the hearing, plaintiffs presented their claim under La. Rev. Stat. § 40:2114(E), which mandates hospitals "establish rules, regulations, and procedures setting forth the nature, extent, and type of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein." Pursuant thereto, plaintiffs argued OGH was negligent because Dr. Zavala "should not have been credentialed and … given full active privileges at [OGH]."  Simply put, she should not have been working in the ED, and thus, they argued this matter is one of "corporate malfeasance in the hiring process":

_____

[2] La. Rev. Stat. § 40:1231.2(B)(1) provides: "The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost."

3

> … This is about whether this doctor, this particular doctor, based on her particular CV, and her particular CME [continuing medical education], and her particular experience and training, was qualified to be in the emergency room by that hospital….
>
> …There's a statutory obligation that the hospital has to not only establish by-laws and rules for the credentialing of its physicians, but also to follow them. And that statutory obligation is where the hospital's duty that we're alleging … was breached … [is] found. It's not in the medical malpractice act. It's 40:2114.

In opposition, OGH argued this case is based "upon a simple act of medical judgment":

> …The plaintiff wants to make it about ten thousand (10,000) other things, but this case is about a doctor, Dr. Zavala, getting a patient in with an ongoing stroke and making a medical judgment and determination whether or not that patient was eligible for tPA administration. That is it! The medical decision and medical judgment is at the heart of this case.

After taking the matter under advisement, the District Court granted plaintiffs' motion. In its reasons for judgment, the District Court first examined the legislative history of the LMMA and its evolving definition of "malpractice," particularly focusing on the Legislature's failure to include "negligent hiring" within that definition despite four separate amendment attempts to do so:

> In 2001, the Louisiana Legislature amended the definition of "malpractice" to include "training and supervision of health care providers." The Legislative history indicates that the original version of Senate Bill 713 sought to add *negligent hiring* and *negligent retention* to the definition of "malpractice" found under La. R.S. 40:1299.41.[3] However, the bill was amended to change "hiring" to "training" and inserted the phrase "or supervision of staff."
> …
> In 2005, House Bill No. 257 (HB 257) sought to revise the definition of "malpractice" under the LMMA to specifically include "acts or omissions in a peer review process or the credentialing of a health care provider." HB 257 failed to be passed by the Legislature.
> In 2006, House Bill No. 260 (HB 260) sought to amend the definition of malpractice to again specifically include "acts or omissions in a peer review process or the credentialing of a health care provider." HB 260 failed to be passed by the Legislature.

---

[3] La. Rev. Stat. § 40:1299.41 was redesignated to La. Rev. Stat. § 40:1231.1 by House Concurrent Resolution No. 84 of the 2015 Regular Session. For consistency, we will refer to this provision by its prior designation.

In 2008, Senate Bill No. 509 (SB 509), Senate Bill No. 668 (SB 668), and House Bill No. 70 (HB 70) each sought to amend the definition of malpractice to specifically include "acts or omissions in the credentialing or re-credentialing of a health care provider." None of these bills made it through the Legislature.

…

At this point, the doctrine of statutory construction *Expressio Unius est Exclusio Alterius*, would seem to apply. This maxim dictates that "when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have easily been included in the statute, is deemed intentional." While it is tempting to infer that the legislature intentionally and repeatedly omitted negligent hiring/credentialing from the definition of malpractice, La. R.S. 24:177[4] prevents the undersigned from making such an inference.

---

[4] La. Rev. Stat. § 24:177 provides:

A. When the meaning of a law cannot be ascertained by the application of the provisions of Chapter 2 of the Preliminary Title of the Louisiana Civil Code and Chapter 1 of Title 1 of the Louisiana Revised Statutes of 1950, the court shall consider the intent of the legislature.

B.(1) The text of a law is the best evidence of legislative intent.

(2)(a) The occasion and necessity for the law, the circumstances under which it was enacted, concepts of reasonableness, and contemporaneous legislative history may also be considered in determining legislative intent.

(b) The legislature may express the intended meaning of a law in a duly adopted concurrent resolution, by the same vote and, except for gubernatorial veto and time limitations for introduction, according to the same procedures and formalities required for enactment of that law.

C. The legislature is presumed to have enacted an article or statute in light of the preceding law involving the same subject matter and court decisions construing those articles or statutes, and where the new article or statute is worded differently from the preceding law, the legislature is presumed to have intended to change the law.

D. A bill introduced but which does not become law is not competent evidence of legislative intent. Any action by the legislature other than enactment of law or adoption of a resolution as provided in Subparagraph (B)(2)(b) of this Section shall not constitute a confession as to the meaning of the law extant.

E.(1) The keyword, one-liner, summary and adjoining information, abstract, digest, and other words and phrases contained outside the sections of a bill following the enacting clause are solely to provide the members of the legislature with general indicia of the content of the bill and are not subject to amendment by the legislature or any committee of the legislature and shall not constitute proof or indicia of legislative intent.

(2) Fiscal and actuarial notes provide the legislature with an analysis of the potential fiscal impact of a bill based on presumptions made by the legislative fiscal officer, actuary, economist, or analyst preparing the note and shall not constitute proof or indicia of legislative intent.

(3) Committee minutes are summary reports of committee proceedings and shall not constitute proof or indicia of legislative intent.

(4) Words and phrases not constituting the substance of an amendment or the recommendations of a conference committee report, and any other legislative staff documents which are not subject to amendment by the legislature or any committee of the legislature, shall not constitute proof or indicia of legislative intent.

…

Simply stated, those words and phrases in legislative bills that are amended out of legislative bills and those bills that do not make it into law are not competent evidence, proof or indicia of legislative intent under La. R.S. 24:177. Apparently the Legislature only wants courts to consider what it actually passes and not to infer legislative intent from those things that fail to become law. (Footnote added)

The District Court then applied the six factor test set forth by this Court in *Coleman v. Deno*, 01-1517 (La. 1/25/02), 813 So.2d 303, to determine whether negligent credentialing falls within the definition of "malpractice" as enacted under the LMMA, concluding:

As stated above, the undersigned considers this case to be a "close call." It is hard for this court to overlook the fact that the LMMA's definition of "malpractice" does not specifically include negligent credentialing of a healthcare provider. The statute is clear and unambiguous. It is also difficult for this court to overlook the fact that the Legislature has tried to amend the definition of malpractice to include negligent credentialing or negligent hiring on at least four (4) occasions—and all attempts were unsuccessful. "[I]t is not the function of the judicial branch in a civilian legal system to legislate by inserting … provisions into statutes where the legislature has chosen not to do so."

On the other hand, this court is apparently bound to apply the *Coleman v. Deno* factors. In this court's opinion, the *Coleman v. Deno* factors can be convincingly argued to suit either party's purpose in any given case. Further it is not clear whether all of the factors need to be met in order to constitute "malpractice." If it is not necessary that all of the factors be met, then how many factors must be met before the alleged act or omission constitutes malpractice? Therefore, this court finds the *Coleman v. Deno* factors can be ambiguous.

…

… [I]n accordance with the Supreme Court's instructions in *LaCoste* [*v. Pendleton Methodist Hosp., L.L.C.*, 07-0008 (La. 9/5/07), 966 So.2d 519, 524] and other cases, the ambiguity is resolved in favor of the Plaintiff and against finding that the tort of negligent credentialing sounds in medical malpractice.… While a hospital's

---

With all due deference to our legislative colleagues, we note while the enactment of laws falls within the sound discretion of the legislative branch, interpretation of those laws fall within the province of the judicial branch. *Unwired Telecom Corp. v. Parish of Calcasieu*, 03-0732, p. 16 (La. 1/19/05), 903 So.2d 392, 404 ("The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of government.… [I]nterpreting the law is the designated function of the judiciary, not the Legislature."). We have also long held: "[i]n many cases, the legislative history of an act and contemporaneous circumstances may be helpful guides in ascertaining legislative intent." *Exxon Pipeline Co. v. Louisiana Public Service Com'n*, 98-1737, p. 9 (La. 3/2/99), 728 So.2d 855, 860.

6

decision to hire or grant privileges to a physician is an *important administrative decision* that affects the quality of treatment a patient receives, it is simply not the same as other *purely medical decisions* made by physicians during the course of a patient's treatment, such as deciding whether to recommend surgery, whether to order diagnostic testing, or which medicine to prescribe.

OGH sought a writ of supervisory review from the Court of Appeal, Third Circuit, which was denied. *Billeaudeau v. Skirlis-Zavala*, 15-821 (La. App. 3 Cir. 9/28/15) (unpublished).[5] This Court likewise denied writ with Justice Guidry concurring "in the writ denial because the issue is to be considered on the merits in the pending appeal." *Billeaudeau v. Skirlis-Zavala*, 15-1948 (La. 11/30/15), 182 So.3d 43. Meanwhile, the District Court certified its grant of partial summary judgment as a final judgment.

On appeal, the appellate court, applying the law of case doctrine, found no palpable error in its previous denial of supervisory writs and affirmed the judgment of the District Court.[6] *Billeaudeau v. Opelousas General Hosp. Auth.*, 15-1034

---

[5] The appellate court panel, composed of Judges Peters, Amy, and Savoie with all three signing, originally issued the following ruling on September 25, 2015: "**WRIT DENIED**. We find no error in the trial court's ruling." The panel then issued a revised ruling signed by Judge Savoie on September 28, 2015, stating simply: "**WRIT DENIED**." The revised ruling also contained the following notations reflecting the votes of the two remaining judges:

> **Peters, J.**, concurs, finding no error in the trial court's ruling.
> **Amy, J.**, dissents and would grant the writ.

[6] Interestingly, OGH challenges in this Court the appellate court's application of the law of the case doctrine. As learned jurist, Albert A. Tate, Jr., explained when organ for the Court in *Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.*, 256 So.2d 105 (La. 1971):

> With regard to an appellate court, the 'law of the case' refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
>
> Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case

(La. App. 3 Cir. 4/6/16), 189 So.3d 561.[7]  While its analysis of the *Coleman* factors differed slightly from that of the lower court, the Court of Appeal nevertheless found the claim for negligent credentialing was not a claim of malpractice under the LMMA under the *Coleman* framework.  It also took into consideration the legislative history of the LMMA—particularly the failure of each bill drafted to include "credentialing" in the definition of "malpractice"—concluding: "We will not create law by judicial fiat when, as here, the legislature clearly failed to do so."

In his dissent, Judge Gremillion opined "the fact that the damages were caused by alleged malpractice and not the credentialing of a physician should end the analysis."  Regardless, Judge Gremillion employed his own analysis of the *Coleman* factors, which ultimately rejected the majority's conclusion and brought him again to his first proposition:

> Simply allowing a bad doctor access to patients at your hospital, without more, gets a plaintiff nowhere.  It is only when that bad doctor does bad things to a patient, and those bad things result in damages, that a patient may recover.

He also rejected the appellate majority's interpretation of the amendments, or rather lack thereof, to the LMMA, reasoning one could just as easily conclude the Legislature felt the inclusion of credentialing was unnecessary because the act of hiring is an act of supervision, explicitly covered in the LMMA.

Plaintiffs have now settled their medical malpractice claims against OGH, solely reserving for review the proper classification of their negligent credentialing

---

principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.

*Day*, 256 So.2d at 107.  In its arguably erroneous, but harmless adherence to this doctrine, the appellate court engaged in a proper *de novo* review to ascertaining whether the prior panel had committed palpable error in its writ denial. Therefore, we see no need to further expound upon Justice Tate's recitation of this doctrine and pretermit discussion of this assignment of error accordingly.

[7] The panel on appeal was composed of Judges Pickett, Genovese, and Gremillion.

8

claim.[8] Accordingly, the only issue presented to this Court is whether plaintiffs' credentialing claim sounds in medical malpractice or in general negligence.[9]

## DISCUSSION

This matter comes before us on a motion for summary judgment, which was granted and affirmed. Appellate review of the granting of a motion for summary judgment is *de novo*, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate. *Bonin v. Westport Ins. Corp.*, 05-0886, p. 4 (La. 5/17/06), 930 So.2d 906, 910. A motion for summary judgment shall be granted if "the motion, memorandum, and supporting documents show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law." La. Code Civ. Proc. art. 966(A)(3). When summary judgment is granted in the context of statutory interpretation, there are no material issues of fact in dispute, and the sole issue before the reviewing court is a question

---

[8] In its "Order and Reasons for Certifying a Partial Summary Judgment as a Final Appealable Judgment," the District Court explained:

> Since rendering that Partial Summary Judgment, the Plaintiffs' medical malpractice claims against the Defendants, Dr. Kondilo Skirlis-Zavala and Opelousas General Hospital, have been resolved, with Plaintiffs reserving their rights to seek excess damages against the Louisiana Patient's Compensation Fund. In addition, Plaintiffs have expressly reserved their right to pursue their negligent credentialing claim against Opelousas General Hospital.

[9] Although OGH asserts there is a split in the circuits on this very issue, we note the circuit cases to which OGH refers all involved mixed allegations of negligent credentialing and supervision or strictly negligent supervision claims and, thus, are clearly distinguishable from the present case, which currently proceeds in this Court strictly on negligent credentialing. *See Talbert v. Evans*, 11-1096 (La. App. 4 Cir. 3/7/12), 88 So.3d 673; *Plaisance v. Our Lady of Lourdes Regional Med. Ctr., Inc.*, 10-348 (La. App. 3 Cir. 10/6/10), 47 So.3d 17; *Dinnat v. Texada*, 09-665 (La. App. 3 Cir. 10/6/10), 30 So.3d 1139; *Bickham v. Inphynet, Inc.*, 03-1897 (La. 8/24/04), 899 So.2d 15. Moreover, OGH claims *Gladney v. Sneed*, 32,107, p. 5 (La. App. 2 Cir. 8/18/99), 742 So.2d 642, 647, affirmed without discussion the application of the LMMA to a negligent credentialing claim in which a jury concluded the defendant hospital "breached its own credentialing procedures in hiring a physician [a second-year pediatric resident] who lacked the necessary training, expertise, or demonstrated competence to work the ER." *Id.* Significantly, however, the appellate court actually stated that "[t]he jury could reasonably find that the breach of credentialing created an environment ripe for malpractice," not that the negligent credentialing was malpractice. *Id.* We further note *Gladney* likewise involved numerous allegations of malpractice against the hospital and its staff, not just credentialing.

9

of law as to the correct interpretation of the statute at issue. *Vizzi v. Lafayette City-Parish Consol. Government*, 11-2648, p. 2 (La. 7/2/12); 93 So.3d 1260, 1262.

In their motion, plaintiffs did not seek summary judgment on the merits of their claim, but rather on whether negligent credentialing is covered by the LMMA. Accordingly, as the District Court correctly found, this matter is one of statutory interpretation. Specifically, we are asked to interpret the LMMA's definition of "malpractice" and determine whether negligent credentialing claims are included in that definition.

Under the general rules of statutory construction, the interpretation of any statutory provision begins with the language of the statute itself. *McGlothlin v. Christus St. Patrick Hosp.*, 10-2775, p. 11 (La. 7/1/11), 65 So.3d 1218, 1227. When the provision is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. La. Civ. Code art. 9; La. Rev. Stat. § 1:4; *Milbert v. Answering Bureau, Inc.*, 13-0022 (La. 6/28/13), 120 So.3d 678, 684. Unequivocal provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. La. Civ. Code art. 11; La. Rev. Stat. § 1:3; s*ee also Snowton v. Sewerage and Water Bd.*, 08-0399, pp. 5-6 (La. 3/17/09), 6 So.3d 164, 168.

Moreover, this court has, without exception, emphasized that the LMMA and its limitations on tort liability for a qualified health care provider apply strictly to claims "arising from medical malpractice." *Coleman v. Deno*, 01-1517, pp. 15-16 (La. 1/25/02), 813 So.2d 303, 315. This is so because the LMMA's limitations on the liability of health care providers are special legislation in derogation of the rights of tort victims, and as such, the coverage of the act should be strictly

construed. *Sewell v. Doctors Hospital*, 600 So.2d 577, 578 (La. 1992). "The primary limiting provisions available to private health care providers are the maximum amount of damages and the mandatory pre-suit review by a medical review panel, along with the special prescriptive and peremptive periods for malpractice actions." *Spradlin v. Acadia-St. Landry Medical Foundation*, 98-1977, p. 6 (La. 2/29/00), 758 So.2d 116, 120. These limitations apply only in cases of liability for malpractice as defined in the LMMA, and any other liability of the health care provider is governed by general tort law. *Williamson v. Hospital Service Dist. No. 1 of Jefferson*, 04-0451, p. 5 (La. 12/1/04), 888 So.2d 782, 786.

The LMMA defines "malpractice" as

> … any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

La. Rev. Stat. § 40:1299.41(A)(8).

Although the statutory provision clearly covers negligent "training and supervision of health care providers," it does not directly address negligence in the credentialing or hiring of said providers. However, while the term "negligent credentialing" is not explicitly provided for within the LMMA, our inquiry does not end there.

Rather, the general definition of "malpractice" recited above focuses on conduct. Cognizant of this, the Court in *Coleman* set forth six factors to assist a court in determining whether certain conduct by a qualified health care provider constitutes "malpractice" as defined under the LMMA:

(1)     Whether the particular wrong is "treatment related" or caused by a dereliction of professional skill,

(2)     Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

(3)     whether the pertinent act or omission involved assessment of the patient's condition,

(4)     whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

(5)     whether the injury would have occurred if the patient had not sought treatment, and

(6)     whether the tort alleged was intentional.

*Coleman*, 01-1517 at pp. 17-18, 813 So.2d at 315-16.

Generally this issue would present on an exception of prematurity, and a court in its trial of the exception would analyze the allegations of the petition under *Coleman* to determine whether they sound in medical malpractice and, thus, must proceed in accordance with the LMMA, or sound in general negligence and, thus, should proceed under general tort law. *Belvin v. Hamilton Medical Center, Inc.*, 07-0127, p. 7 (La. 6/29/07), 959 So.2d 440, 445. Although this matter is on summary judgment, it still logically follows a court must analyze plaintiffs' claims under the *Coleman* factors, as the lower courts did herein, to determine whether they sound in medical malpractice or general negligence. Accordingly, we must apply the *Coleman* factors to the negligent credentialing allegations, to determine whether this claim falls outside the LMMA and, therefore, would entitle plaintiffs to summary judgment as a matter of law.

As recited above, plaintiffs specifically alleged in their petition that OGH was negligent in credentialing Dr. Zavala. In their motion for summary judgment, plaintiffs expounded upon that allegation, crouching OGH's decision to grant credentials to Dr. Zavala in terms of an administrative decision, not a medical one. They further argued OGH was negligent in:

(1)     allowing Dr. Zavala to have privileges in its ED because she lacked the experience and training required by OGH's own by-laws governing the granting of privileges, namely she had not been working full-time in an ED for at least one year prior to receiving privileges;

(2)     failing to follow up on a "qualified" reference given by an emergency medicine physician at the time Dr. Zavala was granted privileges;

(3)     failing to investigate two malpractice claims filed against Dr. Zavala before she sought privileges at OGH.

(4)     failing to investigate Dr. Zavala's failure to produce evidence she had completed CME in emergency medicine training (also required by OGH's by-laws).

With these arguments and allegations in mind, we turn now to an application of the *Coleman* factors.

### (1) Whether the particular wrong is "treatment related" or caused by a dereliction of professional skill?

Analyzing this factor, the District Court reasoned the scope of the duty to select competent physicians is to ensure a hospital's patients receive proper medical treatment. While the credentialing of physicians is an independent, non-medical act that is administrative or managerial in nature, the District Court nevertheless found "it is inseparable from its ultimate purpose—to ensure that patients receive quality of medical care and treatment during their hospital visit or confinement." Therefore according to the District Court, the breach of a hospital's duty to select competent physicians with reasonable care does, at least partially, involve "treatment of the patient" and "health care," satisfying this factor.

All three judges composing the appellate panel disagreed. The majority along with the dissenting judge all agreed this case does not require the court to review the treatment of Brandi in determining whether OGH was negligent in hiring Dr. Zavala.

In line with the District Court's reasoning, OGH argues the decision to extend privileges in the first instance may not be temporally related to the

individual treatment the professional may deliver in the future—when the patient presents herself to the ED for treatment—but it seems obvious both the initial decision to extend privileges and subsequent decisions to renew or retain such privileges, in light of known malpractice claims against the physician, necessarily involve the assessment of that physician's qualifications and abilities to render health care and provide medical treatment. For support, OGH looks to this Court's recent decision in *Dupuy v. NMC Operating Co., LLC*, 15-1754 (La. 3/15/16), 187 So.3d 436, where we determined a hospital's negligence in maintaining and servicing equipment utilized in the sterilization of surgical instruments fell within the LMMA. In so concluding, we reasoned "there is no requirement that an action must be contemporaneous with a patient's treatment in order to fall under the MMA." *Dupuy*, 15-1754 at p. 10, 187 So.3d at 442. We further extrapolated:

> … The use of the broad term "health care provider," rather than simply "physician" or "medical doctor," necessarily includes actions which are treatment related and undertaken by the Hospital in its capacity as a health care provider—even if those actions are not performed directly by a medical professional.

*Id.* at p. 11, 187 So.3d at 443. Relying on this reasoning, OGH now argues exposing future patients to allegedly unqualified physicians with ED privileges seems to be even more fundamentally related to medical treatment than exposing future patients to unsterilized medical equipment. And further it seems apparent to OGH the decisions made by members of a hospital's credentialing committee, whether those members are physicians or not, bear fundamentally on the "health care" being offered by the hospital through the physicians they employ or credential.

Contrarily, plaintiffs argue negligent credentialing is not an activity that is "treatment related" within the meaning of the LMMA, nor does this activity involve a dereliction of professional medical skill, like the failure to perform

14

medical care or treatment properly. Plaintiffs distinguish *Dupuy*, which concerned the failure to disinfect medical equipment used in that particular patient-plaintiff's surgical procedure. By contrast, plaintiffs claim Dr. Zavala's negligent credentialing was not specific to Brandi and did not occur during her care, treatment, or confinement. That is, Dr. Zavala's credentialing was not a "preliminary safeguard" rendered before Brandi's specific treatment in the ED, like the disinfection process utilized in *Dupuy*. Rather, plaintiffs rely upon this Court's holding in *Williamson* wherein we decided a hospital's alleged negligence in failing to repair a wheelchair and to make sure it was in proper working condition before returning it to service was neither "treatment related" nor caused by a dereliction of "professional skill" as the wrongs alleged were "not directly related to, nor [did] they involve, treatment of this patient." 04-0451 at p. 12, 888 So.2d at 790. Plaintiffs likewise rely upon *LaCoste v. Pendleton Methodist Hospital, LLC*, 07-0008 (La. 9/5/07), 966 So.2d 519, 526, and the holding of this Court that a hospital's negligent administrative decisions—in failing to (1) design, construct, and/or maintain its facility to provide emergency power to sustain life support systems during and in the aftermath of Hurricane Katrina, (2) implement adequate evacuation plans, and (3) have facilities available to transfer patients in emergency or mandatory evacuations—did not relate to medical treatment or a dereliction of professional skill within the meaning of this factor. 07-0008 at pp. 9-10, 966 So.2d at 525-26.

As the District Court noted, this factor can be artfully argued either way. But while the staffing of a hospital does in some aspects involve the degree and quality of the health care provided by the hospital, the decision to hire a physician in and of itself is *administrative* and does not directly relate to the treatment of any given patient or involve a dereliction of professional skill. Though credentialing

15

allows a physician access to the hospital, the treatment-related medical decisions and dereliction of skill with which the LMMA is concerned, and for which a hospital can be held liable for "malpractice," fall under the "supervision and training of the health care providers" once they enter the building and engage in the practice of medicine therein. Therefore, under this factor, a claim for negligent credentialing, separate and distinct from a claim for negligent supervision, weighs in favor of our finding general negligence more so than malpractice.

### *(2) Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached?*

With respect to this second factor, the District Court reasoned that while there was a certain level of professional skill associated with credentialing, this evidence likely deals more with hospital administration, hospital policies and procedures, and physician credentialing policies and procedures as opposed to actual medical issues. Nevertheless, the District Court concluded this factor was satisfied because the jury may need expert testimony to explain the standard of care, though not necessarily a medical expert. The appellate court agreed with the lower court that this factor weighs in favor of finding the claim sounds in malpractice, but it also emphasized the expert evidence or testimony is not medical because the applicable standard of care is not the proper administration of tPA, but the hospital's decision-making process in evaluating qualifications necessary to work as an ED doctor.

OGH once again relies on our holding in *Dupuy*, arguing that while jurors might be able to conclude physicians should be properly qualified before a hospital extends them ED privileges, medical expertise will be necessary to establish whether Dr. Zavala was in fact properly qualified for the job. Plaintiffs, on the other hand, argue expert medical evidence is clearly not required to explain to

16

laypersons that OGH negligently credentialed Dr. Zavala to work as an emergency medicine physician at its hospital. According to plaintiffs, the credentialing function is administrative in nature and concerns adherence to a hospital's bylaws; it does not involve intricate medical issues that laypersons will find difficult to understand, such as the standard of care for performing a surgical procedure. In support of their position, plaintiffs direct the Court's attention to the medical review panel process required for all malpractice claims under the LMMA and argue such a panel in a credentialing case could not be composed of healthcare providers because the individuals with knowledge of the duty of care required in credentialing are all medical staff employees who are not licensed to practice medicine. They also rely upon *LaCoste*, particularly our finding a hospital's failure to formulate and execute properly an evacuation plan was not malpractice even though the duty of care required experts to explain *technical*, as distinguished from *medical*, terms.

Unlike the lower courts, we do not believe this factor weighs in favor of malpractice. While the standard of care may very well require expert testimony, that testimony is not of the *medical* nature required in *Dupuy* to determine "whether [surgical] instruments were in fact properly sterilized" before surgery. *Dupuy*, 15-1754 at p. 12, 187 So.3d at 443. Therein, plaintiffs would be required to present *medical experts* to explain what the protocol for such maintenance entailed and the necessity of following that protocol. *Id*. Herein, plaintiffs are alleging a breach of this particular hospital's by-laws and administrative procedures, not nationally recognized sterility standards. While a combination of fact and expert witnesses will most likely be necessary to aid the jury in understanding the hospital's policies and procedures in credentialing its physicians in order to determine whether the hospital breached the duties imposed therein—the specific

17

wrong alleged in this case—, expert *medical* evidence is not necessary to establish the breach in this case. Therefore, this factor as well falls in favor of finding the claim sounds in general negligence.

### (3) Whether the pertinent act or omission involved assessment of the patient's condition?

As to this factor, the District Court found it difficult to say whether this factor applies to the instant case because while the act of negligent credentialing by itself does not involve assessment of the patient's condition, a hospital should ensure the physician has the ability to assess those conditions he/she is likely to be presented with in an ED setting before credentialing the physician. The appellate court, however, succinctly found an analysis of OGH's credentialing methods as they relate to Dr. Zavala would not require any assessment of Brandi's condition.

Citing again *Dupuy's* observation that negligent conduct need not be contemporaneous with a patient's treatment to fall under the LMMA, OGH presents an argument in line with the District Court's reasoning: "It seems obvious that entrusting patients to physicians with emergency room privileges necessarily involves some anticipation of the treatment likely to be needed for patients seeking emergency care and an assessment of the physician's training and ability to 'render' and 'render timely' that 'health care' likely to be needed." In opposition, plaintiffs assert OGH's negligent decision to credential Dr. Zavala was not based on any individual medical assessment but rather, was an administrative decision made by OGH's Board of Directors, months before Brandi ever presented for treatment.

Our analysis of this factor coincides with that of the appellate court. The administrative decision to credential Dr. Zavala did not involve the "assessment of the patient's [Brandi's] condition," or the actual medical assessment of *any*

patient's condition. Consequently, this factor likewise mitigates against a finding of malpractice.

>*(4) Whether the incident occurred in the context of a physician/patient relationship, or was within the scope of activities which a hospital is licensed to perform?*

As both lower courts correctly noted, credentialing is within the scope of activities a hospital is licensed to perform, specifically under La. Rev. Stat. § 40:2114(E), which provides: "A hospital shall establish rules, regulations, and procedures setting forth the nature, extent, and type of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein." Accordingly, regardless of the plaintiffs' arguments that this matter does not occur in the context of a physician/patient relationship, this factor clearly applies in this case and weighs in favor of finding this matter falls within the LMMA.[10]

>*(5) Whether the injury would have occurred if the patient had not sought treatment?*

The District Court found this factor was also difficult to apply in this case. As the court explained, plaintiffs contend Brandi presented to the ED with symptoms of a stroke. Brandi needed treatment from a medical professional regardless of whether it was OGH and Dr. Zavala or someone else. Plaintiffs

---

[10] Notably, amicus curiae, and plaintiffs to an extent, attempt to cast the issue strictly within the confines of La. Rev. Stat. § 40:2114 and argue any discussion of "malpractice" is misplaced because this provision (1) numerically falls outside the LMMA, La. Rev. Stat. § 40:1299.41 *et seq.*, and (2) imposes an "affirmative, *statutory duty* to hire and allow privileges only to competent, able physicians." However, this particular *Coleman* factor expressly brings credentialing within the perimeters of our LMMA "malpractice" discussion/analysis as it falls "within the scope of activities which a hospital is *licensed* to perform." Further, the very definition of "malpractice," specifically includes "*all legal responsibility* of the health care provider." And "tort" is defined as "any breach of duty." La. Rev. Stat. § 40:1299.41(A)(7). Amicus also argues credentialing does not constitute "health care" as defined by the LMMA to mean "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient *during* the patient's medical care, treatment, or confinement." La. Rev. Stat. § 40:1299.41(A)(9). Because our *Coleman* analysis is dispositive, we pretermit any discussion of this interpretation of "health care" or how such an interpretation would affect our holding in *Dupuy*.

allege Dr. Zavala did not diagnose those symptoms in a timely manner and failed to treat the stroke properly. Essentially, they are asserting (1) the effects of the stroke may not have been as severe had Dr. Zavala properly diagnosed and treated the stroke, and (2) the damages would not have occurred but for OGH credentialing Dr. Zavala, who they contend was not qualified to be an ED physician.

The Court of Appeal found plaintiffs contentions "a peculiarly circular type of analysis." While Brandi's alleged injuries relate to the treatment provided by Dr. Zavala, the credentialing decisions of OGH were not necessarily tied to the treatment of Brandi. And though agreeing this factor was difficult to apply, the appellate court concluded it weighs against treating the claim as malpractice.

According to OGH, this factor is satisfied because the gravamen of plaintiffs' injury claims is that Brandi would not have suffered injury but for Dr. Zavala's alleged malpractice in failing to timely diagnose stroke or administer tPA and that Brandi might very well have received the proper treatment she needed had OGH not granted or retained Dr. Zavala's ED privilege. Plaintiffs concede by necessity Brandi's injuries would not have occurred had she not presented to OGH for treatment, but argue this is why the *Coleman* factors must be examined in their totality. In this vein, plaintiffs advance the *LaCoste* court's instruction to focus on whether the injury is related to "medical treatment" as a "but for rationale may be overly facile when considering this factor." *LaCoste*, 07-0008 at p. 15, 966 So.2d at 529. Styled in such light, OGH's negligent credentialing of Dr. Zavala cannot constitute "medical treatment" within the meaning of this factor, and so according to plaintiffs, it is not helpful to the analysis.

In analyzing this factor, we take particular guidance from our holding in *LaCoste*, where we explained:

This factor is somewhat difficult to evaluate in the context of the factual allegations in this particular case. The defendant argues that the thrust of the plaintiffs' petition is that Mrs. LaCoste did not receive the treatment she was presumably seeking when she presented herself to the hospital. Thus, the defendant asserts, this is a claim for an injury unique to Mrs. LaCoste's status as a patient. The plaintiffs rely on this court's caution in *Williamson* that a "but for" rationale may be overly facile when considering this factor. 04-0451, p. 14, 888 So.2d at 790. In a general sense, any wrong that a patient suffers in a hospital or doctor's office would not occur if the patient had not first entered the facility. Yet, many claims of medical malpractice resulting from omissions might not qualify as medical malpractice if this factor were applied singly and without relation to the other *Coleman* factors, because an omission, such as a failure to diagnose, ostensibly leaves a patient in the same position as she would have been in had she never sought treatment in the first place. The defendant's argument that this is a "failure to treat" case is subsumed in the first factor, which considers whether the particular wrong is treatment related or the result of a dereliction of professional skill[.] Given that we have found that the particular wrongs alleged in the petition as amended were neither treatment related nor the result of a dereliction of professional medical skill, the possibility that, had she not been admitted to the hospital, Mrs. LaCoste might have lived or, conversely, that she would have nevertheless died as a result of her pneumonia, or even that her condition would have remained the same, does not weigh greatly in favor of finding that the wrongful conduct alleged in the petition as amended was medical malpractice within the confines of the LMMA.

*LaCoste*, 07-0008 at pp. 15-16, 966 So.2d at 528-29. Notably, *LaCoste* involved the failure of a life support system that was far more integral to the patient's care and treatment than the administrative decision to hire a physician herein, which we have already found in our first factor analysis is not treatment related. Therefore, we find this factor likewise does not weigh greatly in favor of finding the negligent credentialing alleged in the petition was medical malpractice under the LMMA.

*(6) Whether the alleged tort was intentional?*

Both the lower courts and the parties agree this factor is not in issue as plaintiffs do not allege any intentional torts.

Repeatedly we have cautioned "[a]n expansive reading of the definition of medical malpractice contained in the MMA runs counter to our previous holdings

that coverage of the Medical Malpractice Act should be strictly construed...." *Williamson*, 04-0451 at p. 8, 888 So.2d at 787. Although OGH asserts plaintiffs' claims sound in medical malpractice or are so intertwined with their settled medical malpractice claims they cannot be severed from those claims, particularly the negligent supervision claims, we find the application of the *Coleman* factors demonstrate the alleged negligent credentialing was *administrative*, not medical, in nature. Consequently, the tortious conduct alleged herein, *i.e.*, OGH's negligent administrative decision making, is separate and distinct from the medical decisions and conduct directly related and integral to the rendering of medical care and treatment by the health care providers to the patient in this case, *i.e.*, the medical malpractice covered by and to subject to the LMMA.

As we explained in *Coleman*, only plaintiffs' claims "arising from medical malpractice" are governed by the LMMA, and all other tort liability on the part of the qualified health care provider is governed by general tort law. Thus, plaintiffs' negligent credentialing claim is not entitled to the limitations on liability contained in the LMMA and should, as the lower courts determined, proceed in accordance with general tort law.

Accordingly under the *Coleman* test, plaintiffs' negligent credentialing claim is weighted in favor of our finding the claim sounds in general negligence and falls outside the purview of the LMMA and its limitations on liability. We find, therefore, plaintiffs are entitled to summary judgment on this issue as a matter of law.

## CONCLUSION

With the assistance of the *Coleman* factors, we have applied the LMMA's definition of medical malpractice to plaintiffs' negligent credentialing claim, and

we conclude this claim does not fall within the provisions of the LMMA. Accordingly, we affirm the judgment of the Court of Appeal.

## DECREE

For these reasons, we hereby affirm the judgment of the Court of Appeal.

**AFFIRMED.**

# SUPREME COURT OF LOUISIANA

## No. 2016-C-0846

## BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU, AND JOSEPH BILLEAUDEAU

## VERSUS

## OPELOUSAS GENERAL HOSPITAL AUTHORITY, DR. KONDILO SKIRLIS-ZAVALA, AND THE SHUMACHER GROUP OF LOUISIANA, INC.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF ST. LANDRY

**JOHNSON, C.J., dissents and assigns reasons.**

I respectfully dissent, finding plaintiffs' claim for "negligent credentialing" falls within the scope of the LMMA.

The LMMA and its limitations on tort liability for qualified health care providers apply strictly to claims "arising from medical malpractice." *Dupuy v. NMC Operating Co.*, 15-1754 (La. 3/15/16), 187 So. 3d 436, 439. Malpractice is defined as "<u>any unintentional tort</u> or any breach of contract <u>based on health care</u> or professional services rendered, or which should have been rendered, <u>by a health care provider, to a patient</u>, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient." La. R.S. 40:1231.1(A)(13) (emphasis added). "Health care" is defined in the LMMA as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the

1

patient's medical care, treatment, or confinement...." La. R.S. 40:1231.1(A)(9). Although "negligent credentialing" is not specifically listed in the definition of malpractice, it is clear the LMMA was broadly written and intended to cover any act of negligence by a healthcare provider in connection with the care, treatment, and confinement of a patient. In my view, OGH's credentialing activities are an inseparable part of the medical services Brandi received. One of a hospital's primary functions is to provide a place in which doctors dispense health care services, and its ability to grant, deny or revoke privileges demonstrates a degree of control over the quality of medical care provided. Thus, a hospital's decision to grant privileges to physicians to treat patients in the hospital's care is fundamentally and inherently related to the delivery of health care and therefore related to medical treatment.

An analysis under the *Coleman* factors reinforces a finding that negligent credentialing falls under the LMMA. In its examination of the *Coleman* factors, the majority finds "the decision to hire a physician in and of itself is administrative and does not directly relate to the treatment of any given patient or involve a dereliction of professional skill." I disagree. The duty to choose competent physicians is necessarily connected to the duty to ensure patients receive proper medical care. Thus, although credentialing itself may be administrative in nature, it is inseparable from its ultimate purpose to ensure that patients receive quality medical care and treatment. I also disagree with the majority's analysis of the second Coleman factor because I find a claim for negligent credentialing requires expert testimony to establish the standard of care applicable to OGH's decision to extend privileges to Dr. Zavala and to establish whether Dr. Zavala was, in fact, properly qualified for the job.

Furthermore, I find it necessary to consider that negligent credentialing alone will not result in injury to a patient unless the physician commits a negligent act. Thus, there can never be a negligent credentialing claim in the abstract, separated from

2

associated negligent treatment or some other negligent act. The harm and damages do not occur until the doctor actually commits malpractice. Brandi's negligent credentialing claim derives from Dr. Zavala's negligent treatment. Viewed in this light, it is clear the negligent credentialing claim is intertwined with the substantive malpractice claim under the LMMA.

The majority's holding that negligent credentialing claims fall outside the scope of the LMMA undermines the purpose and intent of the statute by excluding from coverage a service which is clearly rendered by the hospital in its role as a health care provider. OGH is now exposed to uncapped liability *for the same acts of malpractice* committed by Dr. Zavala, or by OGH if it failed to adequately supervise or train a physician employee, both of which would undoubtedly be covered by the LMMA. OGH's duty to its patients is the same whether the medical care is provided by physicians directly employed by the hospital or by a physician granted courtesy emergency room privileges, such as Dr. Zavala. The majority effectively gives medical malpractice plaintiffs a back door to avoid the LMMA relative to negligent acts committed by non-employee physicians who are extended privileges to practice in a hospital.

This court has explained that the legislature enacted the Medical Malpractice Act in 1975 in response to a perceived medical malpractice insurance crisis. See *Williamson v. Hospital Service Dist. No. 1 of Jefferson*, 04-0451 (La. 12/1/04), 888 So. 2d 782, 785-86 (citations omitted). The legislature intended the LMMA to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the public. *Hutchinson v. Patel*, 93-2156 (La. 5/23/94), 637 So. 2d 415, 419. This court has further recognized that, to achieve those goals, the LMMA provides qualified health care providers two advantages in actions against them for malpractice, namely, a limit on the amount of damages and the requirement

3

that the claim first be reviewed by a medical review panel before commencing suit in a court of law. Id. Plaintiffs cannot use artful pleading to avoid the LMMA's requirements when the essence of the suit is a medical malpractice claim. "In general, any conduct by a hospital complained of by a patient is properly within the scope of the [Medical Malpractice Act] if it can reasonably be said that it comes within the definitions of the Act, even though there are alternative theories of liability." *Richard v. Louisiana Extended Care Centers, Inc*., 02-0978, (La. 1/14/03), 835 So. 2d 460, 467-468.

For the above reasons, I would hold that credentialing is directly related to the provision of health care and a claim for negligent credentialing is, therefore, not excluded from the LMMA.

10/19/16

# SUPREME COURT OF LOUISIANA

## NO. 2016-C-0846

## BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU, AND JOSEPH BILLEAUDEAU

## VERSUS

## OPELOUSAS GENERAL HOSPITAL AUTHORITY, DR. KONDILO SKIRLIS-ZAVALA, AND THE SHUMACHER GROUP OF LOUISIANA, INC.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF ST. LANDRY*

**WEIMER, J.**, concurring.

"[J]urisprudence, even when it arises to the level of *jurisprudence constante*, is a secondary source of law." **Delta Chemical Corp. v. Lynch**, 07-0431, p. 13 (La.App. 4 Cir. 2/27/08), 979 So.2d 579, 588 (citing Alvin B. Rubin, *Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad*, 48 La. L. Rev. 1369, 1372 (1988)).

Here, the primary source of law which guides our decision is statutory. This case turns on whether the Louisiana Medical Malpractice Act (LMMA) addresses what has been described as "credentialing" of a physician to work in a hospital emergency room. More specifically, the focus is whether La. R.S. 40:1299.41(A)(8)[1] includes credentialing or its equivalent within the LMMA's definition of malpractice.

After observing that credentialing is not explicitly mentioned in La. R.S. 40:1299.41(A)(8), the majority proceeds directly to the six-factor test from **Coleman v. Deno**, 01-1517, pp. 17-18 (La. 1/25/02), 813 So.2d 303, 315-16. Those six factors may be used "to assist a court in determining whether certain conduct by a qualified

---

[1] La. R.S. 40:1299.41(A)(8) was redesignated as La. R.S. 40:1231.1(A)(13) by La. H.R. Con. Res. 84, § 7(F)(ii) (2015).

health care provider constitutes 'malpractice' as defined under the [L]MMA." **Williamson v. Hospital Service Dist. No. 1 of Jefferson**, 04-0451, p. 6 (La. 12/1/04), 888 So.2d 782, 786. However, because of the primary role of statutory law, any applicable traditional methods of statutory interpretation should be exhausted before resorting to assistance from the jurisprudential test in **Coleman**.

Here, I find the rule of statutory construction *expressio unius est exclusio alterius* applicable. The rule has been recognized as an "established legal maxim," and dictates "that when a law specifically enumerates certain items but omits other items, the omission is deemed intentional." **Anderson v. Ochsner Health System**, 13-2970, p. 6 (La. 7/1/14), 172 So.3d 579, 583.

The legislature's definition of "malpractice" in the LMMA lists various acts and omissions. The list is lengthy and contains over a dozen concepts:

> "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

La. R.S. 40:1299.41(A)(8).[2]

The majority accurately notes that the nearest definition within La. R.S. 40:1299.41(A)(8) to credentialing is "training and supervision of health care providers." Under a plain language interpretation called for in La. R.S. 1:4,[3] credentialing is distinct from "training and supervision." Credentialing involves

---

[2] See note 1, *supra*.

[3] "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." La. R.S. 1:4.

granting a physician privileges, in this case to practice in the hospital's emergency room. The thrust of plaintiffs' credentialing claim is that the hospital never should have granted Dr. Zavala those privileges in the first place. In contrast, the thrust of a "training and supervision" claim (also made in plaintiffs' petition, but not directly at issue here) is that after the hospital granted privileges, it failed to meet its later and ongoing responsibility to ensure that Dr. Zavala was given appropriate direction to perform her role as an emergency room physician. Finding that plaintiffs' credentialing claim focuses on different times and on different duties than a "training and supervision" claim, I find that the legislature's omission of credentialing in its detailed list of definitions to be an important indicator of the legislature's intent not to subject a credentialing claim to the constraints of the LMMA.[4]

The definitional list in La. R.S. 40:1299.41(A)(8) is preceded by the direction that "any unintentional tort or any breach of contract based on health care or professional services rendered ... by a health care provider, to a patient" is governed by the LMMA. The plain language just quoted excludes credentialing from its scope, because credentialing involves a hospital administrative act, rather than the exercise of patient care.

To reiterate, both the plain statutory language and the omission of credentialing are important indicators of legislative intent for the specific question presented here. However, because of this court's earlier observation that the LMMA is intended to

---

[4] The district court decided not to apply the *expressio unius maxim*, observing that proposed legislation would have explicitly mentioned credentialing in La. R.S. 40:1299.41(A)(8), but the legislature never adopted those proposals. In the district court's view, because La. R.S. 24:177(D) provides that "[a] bill introduced but which does not become law is not competent evidence of legislative intent," the court was prohibited from applying the *expressio unius maxim*. However, and without expressing any view on the efficacy of La. R.S. 24:177(D), I find no bar to applying the *expressio unius maxim* to the list of acts and omissions the legislature has actually enacted in the LMMA. Stated differently, La. R.S. 24:177(D) purports to prohibit inferring legislative intent from legislation that has not been enacted; the statute does not purport to prohibit inferring legislative intent from enacted legislation.

3

"apply strictly to claims 'arising from medical malpractice,'" it is therefore appropriate to delve further by applying the six-factor test from **Coleman** "to assist" this court's inquiry.  See **Williamson**, 04-0451 at 5, 888 So.2d at 786 (quoting La. R.S. 40:1299.41(I)).[5]

I fully agree with the application of the **Coleman** test.  As the majority concludes, plaintiffs' credentialing claim is not governed by the LMMA.  However, I believe the **Coleman** test is secondary to traditional methods of statutory interpretation.  I find that traditional methods, such as reviewing the plain language of La. R.S. 40:1299.41(A)(8) and applying the *expressio unius maxim*, strongly point to allowing plaintiffs' claim to be litigated–untethered from the strictures of the LMMA.  Without implying that it is always necessary to seek assistance from the **Coleman** factors, the novelty of this issue and the repeated presentation of the pivotal definition of malpractice to the legislature for amendment, weigh in favor of applying those factors to aid in determining legislative intent.  Even after utilizing traditional methods of statutory interpretation and applying the **Coleman** factors, I find that this case presents a close call.  Therefore, it would not surprise me to see the legislature revisit the issue of credentialing.  In my view, the **Coleman** factors have been correctly applied in the majority opinion, and those factors support the conclusion reached under traditional principles of statutory interpretation, *i.e.*, the statutory definition of medical malpractice does not include physician credentialing.

For these reasons, I respectfully concur.

---

[5] La. R.S. 40:1299.41(I) was redesignated as La. R.S. 40:1231.1(I) by La. H.R. Con. Res. 84, § 7(F)(ii) (2015).

SUPREME COURT OF LOUISIANA

No. 2016-C-0846

BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU,
AND JOSEPH BILLEAUDEAU

VERSUS

OPELOUSAS GENERAL HOSPITAL AUTHORITY,
DR. KONDILO SKIRLIS-ZAVALA, AND
THE SHUMACHER GROUP OF LOUISIANA, INC.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF ST. LANDRY

**GUIDRY, J., dissents and assigns reasons.**

I respectfully dissent from the majority's holding that a claim for "negligent credentialing" of a physician by a health care provider such as a hospital does not fall within the purview of the Louisiana Medical Malpractice Act ("LMMA"). I disagree with the majority's application of the factors set forth by this court in *Coleman v. Denno*, 01-1517 (La. 1/25/02), 813 So.2d 303. More importantly, I believe the majority has incorrectly interpreted the definition of malpractice in the LMMA to determine that credentialing of a physician by a hospital to work in its emergency room is not encompassed within the scope of that definition. The LMMA encompasses "[a]ny unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including … all legal responsibility of a health care provider arising from acts or omissions ... in the training or supervision of health care providers ...." La. R.S. 40:1299.41(A)(8). Thus, the question before the court is whether credentialing a doctor to practice in a hospital is an act of rendering professional services by that hospital to its patient or, perhaps more

specifically, an act of supervision of a physician by that hospital. In my opinion, credentialing a doctor to practice in a hospital falls under both.

The majority is correct that the LMMA is intended to "apply strictly to claims 'arising from medical malpractice.'" *Williamson v. Hospital Service Dist. No. 1 of Jefferson*, 04-0451, p. 5, 888 So.2d 782, 786. However, the plaintiffs' claim for damages here can only "arise from medical malpractice." Notably, the majority never answers the question of whether negligent credentialing causes any compensable damages to the patient in the absence of malpractice committed by the doctor who was granted privileges via the credentialing process. For example, if a hospital granted privileges to an allegedly unqualified but otherwise licensed doctor to work in its hospital, and the doctor commits no malpractice and performs all of her medical duties flawlessly, then there would be no harm from the negligent credentialing itself, because compensable damages will never occur until the doctor actually commits malpractice resulting in injury to the patient.[1] In my view, therefore, the injury to the patient does not originate from the hospital's decision to grant privileges to the doctor but more logically from its failure to properly train and supervise her after it grants such privileges and that failure results in injury to the patient.

I agree with the dissenting judge below that negligent credentialing is so intertwined with the substantive malpractice claim underlying the suit against the health care provider that the legislature could not have intended to separate the two claims, particularly when it amended the LMMA in 2001 to include within the definition of malpractice "all legal responsibility from acts and omissions ... in the training and supervision of health care providers." La. R.S. 40:1299.41(A)(8).

---

[1] Surely the majority is not countenancing that a claim for negligent credentialing can lie in the absence of malpractice by the particular doctor.

2

Even if one argues the hospital's breach of its own procedures for granting physician privileges "creates an environment ripe for malpractice," any damages to the patient only occur if the hospital thereafter fails to properly train and supervise that doctor and that doctor commits malpractice injuring a patient.

In my view, credentialing of a physician, that is, vetting a physician before granting her privileges in the emergency room, logically falls within the health care provider's duty of "training and supervision of health care providers." That the legislature has declined to specifically include "credentialing" within the definition of malpractice when it has included "training and supervision" is not determinative of legislative intent, in my view, because it is just as reasonable to conclude the legislature believed a credentialing claim was already included within the definition of malpractice in the LMMA as amended in 2001.

Additionally, the language in the LMMA provides that medical malpractice includes "any unintentional tort or any breach of contract based on health care or professional services rendered . . . by a health care provider, to a patient …." La. R.S. 40:1299.41(A)(8). Applying that language to the claim here, I find the alleged failure of a hospital to properly credential a physician before granting her privileges in the hospital's emergency room also falls squarely within the context of "professional services rendered . . . by a health care provider, to a patient…." La. R.S. 40:1299.41(A)(8). To dismiss the hospital's process of credentialing its physicians as merely "administrative" misconstrues and belies the statutory duty placed on the hospital by the LMMA to render professional services to the patient. "Professional services" owed by the hospital to its patient would necessarily encompass providing doctors who are qualified to practice, as well as doctors who are properly trained and supervised. Thus, under a common sense interpretation of

3

the language of the Act, the process of credentialing a physician to provide medical treatment to the patient on behalf of the health care provider falls within the "professional services" owed to that patient by the health care provider.

I further disagree with the majority's application of the *Coleman* factors to find a claim for negligent credentialing falls outside of the LMMA. I agree with the district court that the duty to select competent physicians with reasonable care is inextricably woven into the hospital's treatment of the patient and the rendering of professional medical services to that patient. In my view, the defendant is correct that the decisions of the hospital's credentialing committee are fundamentally related to health care being offered by the hospital through the physicians it employs or credentials. This factor therefore militates in favor of applying the LMMA.

Additionally, based on the plaintiffs' allegations, I would find expert medical evidence is necessary to determine whether the appropriate standard of care was breached by the hospital. While the majority concedes a jury would need expert witness testimony to determine whether the hospital breached its credentialing procedures, it finds expert *medical* evidence is unnecessary. But the plaintiffs' claims are: that Dr. Zavala lacked the necessary experience and training required by the hospital's by-laws, that the hospital should have followed up on a "qualified" reference given by an emergency room physician, that the hospital failed to investigate two prior malpractice claims, and that Dr. Zavala failed to produce evidence she had completed CME in emergency medicine training. Each of these allegations requires expert *medical* testimony to determine whether Dr. Zavala had the proper training, experience, and qualifications to be granted

4

privileges in the emergency room, and whether the prior malpractice complaints against her precluded her from being granted such privileges.

As to whether the pertinent act or omission involves assessment of the patient's condition, I agree with the reasoning of the district court: a hospital should ensure that a physician granted privileges possesses the requisite ability to assess a patient's condition when she presents in the emergency room. Although it is not the particular patient's condition at issue, the hospital in credentialing a physician must understand and anticipate the treatment to be needed for patients seeking emergency care and make an assessment of the physician's training and ability to render and render timely the health care likely to be needed.

As to whether the incident occurred in the context of a physican/patient relationship or was within the scope of activities that a hospital is licensed to perform, the majority finds this factor weighs in favor of finding the claim of negligent credentialing falls within the LMMA. I agree.

Finally, as to whether the injury would have occurred if the patient had not sought treatment, I disagree with the majority's rejection of the defendant's argument that the gravamen of the plaintiffs' claim is as follows: that the plaintiff would not have suffered injury but for the alleged malpractice in failing to timely diagnose the stroke or to administer tPA and that plaintiff might have received proper treatment if the hospital had not granted or retained the physician's privileges. For the reasons I espoused above, I disagree with the majority's determination that the credentialing of the physician in this case was not "treatment related." Thus I would find this factor weighs in favor of applying the LMMA.

In sum, I would conclude the plaintiffs' claim of negligent credentialing of a physician by a health care provider such as a hospital falls within the purview of

the LMMA, both under the plain language therein and after analysis of the factors

set forth in *Coleman*.

SUPREME COURT OF LOUISIANA

No. 2016-C-0846

BRANDI BILLEAUDEAU, VERONICA BILLEAUDEAU,
AND JOSEPH BILLEAUDEAU

VERSUS

OPELOUSAS GENERAL HOSPITAL AUTHORITY,
DR. KONDILO SKIRLIS-ZAVALA, AND
THE SHUMACHER GROUP OF LOUISIANA, INC.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF ST. LANDRY

**CLARK, J., dissents for the reasons assigned by Justice Guidry and assigns additional reasons.**

I respectfully dissent from the majority opinion for the reasons assigned by Justice Guidry. I write separately to point out that the majority's decision does not comport with the Court's recent decision in *Dupuy v. NMC Operating Co., L.L.C.*, 15-1754 (La. 3/15/16), 187 So. 3d 436, where we held a hospital's negligence in maintaining and servicing equipment utilized in the sterilization of surgical instruments fell within the Louisiana Medical Malpractice Act, despite the fact the negligence occurred before the patient entered the hospital and the sterilization procedure was not performed by a physician but by plant operations. In my opinion, exposing patients to an allegedly unqualified, although licensed, physician with emergency department privileges, due to the negligent credentialing by the hospital, is even more fundamentally related to medical treatment and the rendering of professional services by the provider than exposing the patients to unsterilized medical equipment.

1

Furthermore, I believe the majority's decision to exclude negligent credentialing claims from the LMMA clearly conflicts with the purpose of the act, *i.e.*, to ensure the availability of safe and affordable health care services to the public and simultaneously limit the significant liability exposure of health care providers. See *Hall v. Brookshire Bros., Ltd.,* 02-2404, pp. 9-10 (La. 6/27/03), 848 So.2d 559,565(citation omitted). Now, any medical malpractice plaintiff whose damages are capped under the act can assert a negligent credentialing claim arising from the same act of malpractice against the health care provider hospital for the same damages, which will be excluded from the cap. The majority's holding will likely lead to more litigation, and undermine the stability and predictability afforded by the LMMA, further escalating health care costs. Such a result is clearly contrary to the legislative intent behind the act. *See Oliver v. Magnolia Clinic*, 11-2132, p. 8 (La. 3/13/12), 85 So.3d 39, 45.

Finally, I note that courts in other states with statutes similar to the LMMA have held negligent credentialing falls within the purview of their respective medical malpractice acts. See, e.g., *Winona Memorial Hospital, Ltd. Partnership v. Kuester*, 737 N.E. 2d 824 (Ind. Ct. App. 2000); *Garland Community Hospital v. Rose*, 156 S.W. 3d 541 (Tex. 2004); *Bell v. Sharp Cabrillo Hospital,* 212 Cal. App. 3d 1034, 260 Cal. Rptr. 886 (Ct. App. 1989).